Harry B. Frank, J.
The defendant city officials move for
summary judgment dismissing the complaint herein as against them. The primary issue is the claimed illegality of a certain lease agreement entered into on April 10, 1970 between the City of New York and 41 Madison Company, the then owner of property located at the southeast corner of Madison Avenue and Twenty-sixth Street, adjacent to the court building which houses the Appellate Division, First Department. Plaintiff Fur-Lex Realty Inc. (hereinafter FurLex) formerly owned the unimproved lot adjoining the easterly end of the courthouse on East Twenty-fifth Street. The city, however, acquired this property by condemnation proceedings in 1965 with the intent of utilizing it for construction of an annex to the courthouse premises which it also owns. Due to its inability to obtain the necessary appropriation of funds for such purpose, the proposed annex was never constructed and said plaintiff has been permitted to continue to occupy and operate the premises as a parking lot.
Although one of plaintiffs, Fur-Lex’s, claims herein is that the city’s exercise of its power to condemn the lot was unconstitutional by reason of the fact that the public purpose for which it was taken has never been effectuated, such contention is patently without merit. The rule is well established that where the fee to property is, in good faith, appropriated for a particular public purpose, the municipality may subsequently convert it to other uses, or even abandon it entirely, without any impairment of the validity of the estate originally acquired or reversion to the former owners (Matter of City of New York, 190 NY 350; Story v New York Elevated R. R. Co., 90 NY 122; Brooklyn Park Comrs. v Armstrong, 45 NY 234; General City Law, § 20, subd 2). In any event, plaintiff FurLex has been allowed to continue in possession of its former property and it appears that there is no danger of its being evicted at any time in the near future. Thus, there is no tenable basis whatever for any claim that said plaintiff has been personally aggrieved by the lease agreement between the city and 41 Madison Company. Nor is there any merit to the *906 claim that the terms of such agreement contravene public policy by failing to provide for adequate financial security to the city in the event of the tenant’s default. In light of the provisions of sections 10.03(c) and 11.03 of the lease, the interest of the tenant or any of its successors or assigns in the office building and the premises upon which it is situated may be reached to satisfy any default judgment the city might obtain against the owner of the leasehold. Such provisions, of course, obviate the need for any security deposit or investigation as to the financial responsibility of proposed assignees of the leasehold, and t*he decision of the city officials involved to dispense with the latter requirements was, under the circumstances, clearly within their sound discretion.
The object of the lease in question was to permit the lessee, or its successor, 41 Madison, Inc. and their principals (hereinafter collectively referred to as the Rudin defendants), to acquire 100,000 square feet of floor area (also commonly referred to as "air rights”) from the adjoining lot, on which the courthouse is situated, so as to enable said defendants, within the framework of the existing zoning resolution, to effect an increase in the height of an office building then under construction on their property. Without such acquisition, the floor area of the proposed building would have been limited by the zoning resolution to 400,000 square feet. With the additional square footage, however, the Rudin defendants could increase the height of their building by an additional 10 stories.
The zoning resolution in effect at the time of the lease prohibited any direct transfer of development rights from the courthouse, because it was a landmark building owned by the city. Moreover, the city could not have merely leased the air rights above the courthouse to effectuate the developer’s purpose, because, under the zoning resolution then and still in effect, such rights are not a factor in the formula provided by the resolution for calculating the maximum floor area which can be utilized for his building (see Matter of Brause [Murdock], NYLJ, Dec. 5, 1958, p 13, col 5). The only two factors used in such computation are the ground lot area of the entire "Zoning lot” and the floor area ratio assigned to such lot by the zoning resolution. The product of these two factors is the maximum permissible floor area which can be utilized for all buildings constructed within the boundaries of such lot. Accordingly, to effectuate the desired increase in the floor area *907 (and, therefore, the height) of their building, the Rudin defendants had to combine their lot with the lot on which the courthouse stands into a single "Zoning lot” as such term is defined in the resolution. The applicable portion of the definition of a "Zoning lot” in section 12-10 is as follows:
"(c). A tract of land, located within a single block, which at the time of filing for a building permit (or, if no building permit is required, at the time of filing for a certificate of occupancy), is designated by its owner or developer as a tract all of which is to be used, developed, or built upon as a unit under single ownership * * *
"For the purposes of this definition, ownership of a zoning lot shall be deemed to include a lease of not less than 50 years duration, with an option to renew such lease so as to provide a total lease of not less than 75 years duration.”
To make the Rudin defendants "owners” of the courthouse lot within the purview of the quoted definition, the agreement of April 10, 1970 provided for a 75-year lease to them of the entire courthouse premises, including land and buildings. It made simultaneous provision for a sublease back to the city of the courthouse building and all unused excess air or floor space over 100,000 square feet in area for a term of 74 years and 364 days, without rental. As a result of this agreement, therefore, the Rudin defendants were entitled to combine their own lot with that leased from the city into a tract constituting a single "zoning lot” of the kind described in section 12-10(c) of the resolution, and having a maximum floor area or air space utilizable for building purposes substantially in excess of the sum of the floor areas of both the courthouse and the planned office building. Moreover, since, by virtue of the sublease, only 100,000 square feet of such excess floor area or air space could be used for the planned office building, the balance might, in the event the city should so elect, be used for the construction of additional floors to the courthouse. The size of the planned office building, therefore, did not violate the zoning resolution; and, since it was thus within the permissible scope of the city’s comprehensive zoning plan, the transfer of air rights or floor area here in question may not, as plaintiff urges, be considered "spot zoning” (see Fitchett Crescent Corp. v City of New York, 155 NYS2d 272; 1 Yokley, Zoning Law and Practice [3d ed.], § 8-5).
Also rejected is plaintiffs’ further contention that section 4.01(a) of the lease agreement granted the Rudin defendants *908 an option to lease air rights over the former property of FurLex which the city had condemned. It is uncontroverted that neither of the parties to such agreement regarded it as having any such effect and a fair reading of the language in controversy indicates that its intent was not to create any option to purchase, but merely to recognize that, in the event the Rudin defendants should thereafter attempt to and succeed in acquiring an interest in a lot contiguous to either the courthouse lot or the office building lot sufficient to meet the "ownership” requirements of section 12-10(c) of the zoning resolution, they would be permitted to combine all such lots so as to effect an even further increase in the height of the building.
Plaintiffs’ further contention to the effect that the rental fixed by the board of estimate resolution authorizing and outlining the essential terms of the lease was so unreasonably low as to amount to a squandering or wasting of city property is likewise rejected. The report of the acting chief of the appraisal division of the city’s department of real estate annexed to the affidavit of the commissioner of that department, submitted in opposition to plaintiffs’ earlier motion for a preliminary injunction, shows how the rental value was arrived at and plaintiffs have failed to submit any affidavit by an expert of their own to rebut or controvert any of the conclusions reached by the author of said report. Consequently, no triable issue can be deemed to have been raised in that regard.
The only remaining argument of any substance raised by plaintiffs upon this application is their contention that the lease to the Rudin defendants violated the competitive bidding requirements of section 384 of the New York City Charter in that the terms of the proposed leasing were so devised by the city officials as to make it virtually impossible for anyone other than the Rudin defendants to bid thereon. There is no doubt, as plaintiffs point out, that the terms of the lease are such that the only person who could avail himself of the rights granted thereunder and fulfill all of its requirements is one who, at the time the proposed letting was advertised, either had or could quickly have acquired ownership in fee of the contiguous lot or who could promptly have acquired a sufficient leasehold interest therein to qualify as an owner under section 12-10(c) of the zoning resolution. Thus, the field of possible bidders was indeed narrowed to either the Rudin *909 defendants or those who might acquire from them the requisite interest in their property.
Prior to the enactment by the Legislature of chapter 757 of the Laws of 1967, there might have been serious doubt as to the validity of such a restriction upon the class of bidders (see Tarshis v City of New York, 24 AD2d 644, mod 24 AD2d 723, affd 17 NY2d 451). By that enactment, however, the provisions of the city charter requiring that any interest of the city in real property be leased “only for the highest marketable price or rental, at public auction or by sealed bid” (New York City Charter, § 384, subd b, par 1) were amended by adding thereto the following sentence: "Any * * * lease may provide for the restriction of the use of such real property to purposes determined by the board of estimate”. Following such amendment, this court has held that the use to which leased realty may be restricted is solely within the discretion of the board of estimate and that, in the absence of a clear demonstration that such discretion has been abused, no basis exists for the court to substitute its judgment for that of the board (Matter of Moran [Duchan], NYLJ, June 30, 1972, p 12, col 1). It should further be observed that, since any restriction upon the use to which property may be put will inevitably result in similarly restricting the class of interested bidders, it is quite apparent that any grant of broad discretionary authority to provide for the former carries with it the corollary authority to lessen the number of competing bidders. There may, of course, as plaintiffs argue, be circumstances under, which such right may be found to have been abused. Thus, as observed by the Court of Appeals in Gerzof v Sweeney (16 NY2d 206, 211): “an objectionable and invalidating element is introduced when specifications are drawn to the advantage of one manufacturer not for any reason in the public interest but, rather, to insure the award of the contract to that particular manufacturer.” Clearly, however, no such situation has been presented in the case at bar. The lease here in question was drawn so as to effectively limit the bidding to the owner or long-term lessee of the adjoining lot (or persons who had the ability to acquire such interests) because, under the zoning resolution, only persons having such status could make any practical or effective use of the limited realty interest it sought to convey. It is evident, therefore, that the favoritism thereby bestowed upon the Rudin defendants emanated not from any unfair or corrupt motive on the part of the defendant officials to benefit *910 them personally, but simply from the fact that the conveyance to them (or their possible successors in interest) was the only legal way in which property determined by said officials to be unnecessary for the city’s future needs could, under the prevailing circumstances, still be used to promote a significant and vital public interest; viz., that of raising much-needed substantial additional revenues without further burden to the individual taxpayers. In the latter connection, the uncontroverted statement by the city’s commissioner of real estate (submitted upon the earlier motion) that the city will realize an average rental of $46,000 per annum over the term of the lease plus additional real estate taxes estimated at $175,000 per annum at the 1970 rates is ample and conclusive evidence that the primary motivating factor in the challenged agreement was the public interest.
As noted by the Court of Appeals in 64th St. Residences v City of New York (4 NY2d 268, 276-277, cert den sub nona. Harris v City of New York, 357 US 907): "At some points in their argument plaintiffs seem to be questioning the validity of the whole system of selling these properties at auctions where there is little likelihood of competing bids. That contention must be rejected (see Kaskel v Impellitteri, 306 NY 73, 95, supra-dissenting opinion but representing the whole court’s views on that question; and see Bleecker Luncheonette v Wagner, 286 App Div 828, mot. for lv. to app. den. 309 NY 1029).” Again, the following language of this court’s decision in the Bleecker Luncheonette case (141 NYS2d 293, 300) is here most appropriate: "The most that can be read into plaintiff’s objection as to public bidding is that the terms of the sale may limit competition. However, in that respect, it has been held that it is proper to restrict competition where it serves the public interest”.
In all of these cases, of course, what is actually involved are two conflicting public interests. Thus, at bar, the interest in free and open competition in the market for municipal property and in the avoidance of possible collusion or dishonesty in the making of contracts therefor is vying with the one favoring the acquisition of additional funds for the public treasury with the least burden and expense to the taxpayers. Where, therefore, as here, the public officials charged with the responsibility of acting in such matters are vested by statute with a broad discretion in deciding which, and to what extent, one of these interests must yield to the other, their choice, so long as *911 it is made in good faith and rests upon a rational basis, should not be disturbed by the courts.
Upon the foregoing analysis, this court concludes that plaintiffs have failed to sustain their charges of illegality on the various actions of the defendant city officials referred to in the complaint. Accordingly, the motion is granted and the complaint as against said defendants is dismissed.