OPINION OF THE COURT
Lucy Billings, J.
I. Background
Petitioner Hunts Point Terminal Produce Cooperative Association, Inc. leases property from respondent City of New York in the Hunts Point Food Distribution Center, which accommodates a variety of public wholesale markets and food distribution businesses and comprises a hub of the food industry worldwide. On November 14, 2005, respondent New York City Economic Development Corporation (EDC) conditionally designated respondent Baldor Specialty Foods, Inc. the new lessee of city-owned property at 155 Food Center Drive, also within the Hunts Point Food Distribution Center, and adjacent to the premises petitioner leases. The premises at 155 Food Center Drive are a significant asset because of their location, size, and available parking facilities in a market where vehicular transportation is a linchpin.
Petitioner’s first cause of action (amended verified petition H 83) seeks, pursuant to CPLR 7803 (3), a determination that the actions by respondents EDC and its President Andrew Alper in awarding the lease for 155 Food Center Drive to Baldor violated lawful procedure, were arbitrary and capricious, or were an abuse of respondents’ discretion. Petitioner asks the court to annul that award and enjoin those respondents and respondent City from entering into that lease as a result of the challenged selection procedure that culminated in the award to Baldor on November 14, 2005. (CPLR 7806.)
On March 23, 2006, based on the petition, the responsive pleadings, the supporting and opposing affidavits and the parties’ extensive written and oral arguments, the court determined that the record raised factual issues requiring a trial on petitioner’s first claim. That nonjury trial ensued over 13 days from March 29 through April 27, 2006. Based on all the testimony and exhibits admitted in evidence, and after hearing closing arguments on May 15, 2006, the court makes the following findings and conclusions as to petitioner’s first claim.
*990 II. Findings of Fact
A. A&P’s Departure from 155 Food Center Drive
The premises at 155 Food Center Drive consist of 15.8 acres and previously were leased by the Great Atlantic & Pacific Tea Co. (A&P) for a warehouse and distribution facility. In early July 2005, A&P left the site, laid off hundreds of employees engaged in operations at the site, and sought to sublet it or to assign the lease. Petitioner, Baldor, and Dairyland USA Corp., another corporation in the Hunts Point Food Distribution Center, all expressed interest in subleasing the site from A&P Displaced tenants of the Bronx Terminal Market (BTM) to the west, near Yankee Stadium, also expressed interest to EDC in leasing available Bronx property. Both petitioner and Baldor made overtures to A&P’s real estate broker regarding its site, but learned that A&P was close to consummating a sublease with Dairyland.
EDC reminded A&P that its lease prohibited any profit from subletting, required the City’s consent to any sublease, permitted the City to withhold that consent for any or no reason, and required the tenant to guarantee its lease obligations during any sublease. A&P then abandoned its negotiations with Dairy-land and in mid-August 2005 began negotiations to surrender the leased premises to the City.
When Dairyland’s transaction with A&P was frustrated, Dairyland threatened to move its 800 jobs out of New York City, a threat reported to EDC. Dairyland pressed EDC, through its Executive Vice-President Brian Murphy and Vice-President of Real Estate Development Melanie Lenz, to deal directly and solely with Dairyland in reletting the premises. EDC resisted that alternative, but nonetheless was pressured to respond expeditiously to Dairyland’s threat.
B. The Site C Process
During the preceding year, EDC had solicited proposals to lease other city-owned property in the Hunts Point Food Distribution Center, site C, an undeveloped vacant parcel. Both Beildor and Dairyland submitted proposals for site C, but the selection process extended over many months, and by August 2005 EDC still had not awarded a lease for that property. Acknowledging this delay, perceiving an obligation to respond somehow to the site C bidders, and realizing their keen interest in the newly available site, EDC communicated to them that it would proceed immediately to a disposition of 155 Food Center Drive before arriving at a disposition of site C.
*991 As a result of the extended site C process, Baldor and Dairy-land dealt with EDO’s officers and employees, who gained familiarity with each corporation’s circumstances, assets, and needs. Through this prior process, EDC was aware that both Baldor and Dairyland, if awarded an alternative site in the Hunts Point Food Distribution Center, would vacate their current facilities nearby, freeing up potential space for the displaced BTM tenants.
C. The BTM Tenants’ Relocation and Dairyland’s Deadline
On August 18, 2005, Brian Murphy communicated to Deputy Mayor Daniel Doctoroff’s staff, referring to 155 Food Center Drive, “that we have no plan to openly bid the site. It would take too long; it would bring into play some companies that might offer more $ but suboptimize our outcome; and it would weaken our chances to deal with the BTM issue effectively.” (Exhibit 26.) Brian Murphy’s subsequent communication to Deputy Mayor Doctoroff s staff, on August 31, 2005, reinforces the connection between the BTM tenants’ relocation and the disposition of the former A&P site at 155 Food Center Drive:
“Next week we will be meeting to discuss the BTM tenants. In anticipation of that meeting I wanted you to be aware of our current thinking on the A+P building. . . .
“Rather than wait until all these puzzle pieces are in place we will fast track the marketing of the property to a short list of interested prospects. The goal is to achieve the best overall outcome for the city and the Hunts Point business community. We are well aware of the politics and urgent nature of this issue.” (Exhibit 27.)
On September 1, 2005, Dean Facatelis of Dairyland applied further pressure. He informed Melanie Lenz that, because Dairyland needed expansion space immediately, (1) Dairyland could not wait any longer for site C, which, even after an award was made, would require development, and (2) if no other nearby expansion space was available for Dairyland, it would move to New Jersey, where it already was looking for space.
On September 12, 2005, when A&P finally committed to a surrender and allowed EDC to offer 155 Food Center Drive to a new tenant, Dairyland stepped up its threat. EDC met with Dairyland to address its concern over losing a sublease to that site. Dairyland repeated its threat to move its business to New Jersey and imposed an ultimatum to carry out that threat un *992 less EDC made a decision about the A&P site by September 30, 2005. EDC worked furiously to meet that deadline.
Thus EDC had two objectives: “to deal with the BTM issue effectively” by attempting to make relocation space available to the BTM tenants (exhibit 26), and to make a decision about reletting 155 Food Center Drive by September 30, 2005. Making space available to Dairyland was an urgent issue; the BTM tenants’ relocation was both politically charged and urgent, a situation EDC was “well aware of.” (Exhibit 27.) Unfortunately these two objectives, both legitimate public purposes, operated unfairly to compromise the public process for selecting the City’s new tenant at 155 Food Center Drive.
Executive Vice-President Murphy’s dissemblance in insisting that the BTM tenants’ relocation was not an objective, after his two subordinates’ contrary testimony and the court’s preliminary ruling that petitioner had supported a prima facie basis for relief, became increasingly apparent to the court as the testimony progressed. His explanation, that other bidders offering more would “suboptimize our outcome” (exhibit 26) referred to an outcome that suboptimally selected an unqualified, speculative venture, not to an outcome that failed to offer a relocation alternative for the BTM tenants, lacked credibility. Given the discretion admittedly accorded to EDC, it was free to readily reject a speculative applicant or proposal, as this witness eventually conceded. His attempt to counteract his subordinates’ credible testimony and his own documents regarding this determinative issue, the gravamen of petitioner’s first claim, is grounds to discredit all his testimony. (See, e.g., People v Whaley, 277 AD2d 151 [1st Dept 2000]; Petrovski v Fornes, 125 AD2d 972, 973 [4th Dept 1986].)
D. The Lease Opportunity
EDC’s lease opportunity or request for proposals (RFP) for 155 Food Center Drive, to be sure, did not openly disclose the lease offering’s objective of providing potential relocation space to the BTM tenants. EDC’s lease opportunity admittedly did succumb to the pressure or need to make a quick decision.
EDC issued its “Long Term Lease Opportunity — 155 Food Center Drive” on September 19, 2005 (exhibit 6) by overnight mailing the previous business day to a selected group of likely interested recipients, and through publication in newspapers of general circulation September 20 through September 22, 2005. The lease opportunity set a September 26, 2005 4:00 p.m. deadline, for responses. Petitioner, Baldor, Dairyland, and three *993 other recipients of the overnight mailing submitted proposals by the deadline.
After describing the 155 Food Center Drive site, the lease opportunity (at 2) sets forth EDC’s “Goals” related to the site:
“(1) As part of a designated New York City public market area, the Site is intended to be used for the wholesale purchase, sale, or storage of food, flowers, or ornamental plants.
“(2) NYCEDC is seeking uses for this Site that are consistent with and complementary to the surrounding market uses, and that would contribute to the overall economy of this area of the Bronx.
“(3) Lease offers that maximize the full development potential of all or a portion of the Site are strongly encouraged.”
These goals thus relate directly and exclusively to uses of the 155 Food Center Drive “Site” and the “public market area,” uses that contribute to the economy of “this” public market area, and tenancies that maximize the development potential of the “Site.” (Id.) The goals nowhere make even passing or indirect reference to the use, economy, or development of any area outside the public market.
The goals are followed by EDC’s “Evaluation Criteria”:
“Economic Impact on/Spending in New York City— projected expenditures, including annual ground lease payments and annual operating costs; permanent on-site employment and payroll; and any applicable New York City taxes . . . ;
“Job Creation and Retention — number of existing permanent jobs and number of projected new permanent jobs;
“Site Utilization — current utilization plans for the Site; and the extent to which future expansion plans maximize the development potential of the Site in a manner consistent with applicable zoning, environmental and other regulatory controls.” (Id. at 3.)
The first evaluation criterion thus relates directly and exclusively to the spending and consequent economic impact that operations “on-site” will generate through lease, wage, and tax payments and other operational expenditures. (Id.) The “permanent jobs” to which the second criterion refers may only reasonably be equated with the “permanent on-site employment and payroll” set forth in the first criterion. (Id.) The only other criterion again relates directly and exclusively to utilization of *994 the “Site” and maximizing the development potential of the “Site.” (Id.) None of the evaluation criteria makes even passing or indirect reference to the economic impact on, spending generated or jobs at, or utilization or development of any site other than 155 Food Center Drive.
The fourth attachment to the lease opportunity (attachment D) is an “Industrial Development Questionnaire.” At the third page of the questionnaire, at the end of 39 categories of “Business Applicant Information,” it asks for the “Proposed use for company’s existing facility (ie. keep for existing operations, sublease, etc.).” (Id. at 14.) This buried inquiry as to an applicant’s proposed use of its current facility may only reasonably be interpreted as part of the applicant’s identifying information describing its business. This reference may not be imported from the “Applicant Information” in attachment D (at 14) to the “Evaluation Criteria” on the second page in the body of the lease opportunity, or even reasonably be considered a factor in evaluating the proposal. Wherever either the evaluation criteria or the goals refer to uses to be considered, the reference is explicitly to uses of 155 Food Center Drive or the public market area. More importantly, the references delineate the types of uses sought. The “Proposed use for company’s existing facility” offers no hint that EDC seeks any type of use or that any type of use will be considered over another. In fact, the inquiry suggests that “keep for existing operations” is the first option and then “sublease” and that any options would be suitable responses. (Id. at 14.)
While this inquiry was there as the fortieth question in attachment D for any applicant to see and answer, an applicant could not be expected to guess that the answer to this question, unless perhaps it revealed a prohibited activity, would be a factor in evaluating a proposal, let alone that EDC sought any particular content in that answer. Proposing a relocation site for any businesses important to the City or to Bronx County or specifically for the BTM tenants, given the politically charged urgency of this publicized issue, may well have been an attractive idea, but it was not a point, express or even implied, of this RFP. Therefore it was irrational and arbitrary for EDC to interpret and apply the lease opportunity otherwise.
E. EDC’s Interpretation and Application of the Lease Opportunity
Nevertheless, the credible evidence establishes that EDC did interpret that fortieth question in attachment D as a question *995 “we must ask” to “facilitate our BTM relocation strategy” (exhibit 5) after “the Bronx Term. Mkt became such a priority” in August 2005. (Exhibit 3.) Petitioner, on the other hand, reasonably did not interpret that question as seeking any particular content that would be a factor in evaluating proposals. Whether Baldor or any other applicant had learned, through dealings with EDC during the site C process or in efforts to lease the A&P site directly from the City without consideration of other possible tenants, or otherwise, that EDC was interested in an applicant’s capacity to free up its current facility, for the BTM tenants or another purpose, is not critical. EDC did know, through its dealings with Baldor and Dairyland, that they would vacate their current sites nearby and that Baldor’s site, at least, would be potential space for the displaced BTM tenants. Thus all Baldor had to do “to facilitate” EDC’s or the City’s “relocation strategy” (exhibit 5), to address that “priority” (exhibit 3), that politically charged and urgent public issue, and help “deal with the BTM issue effectively” (exhibit 26), was to answer that fortieth question in attachment D with facts EDC already knew.
The credible evidence establishes that EDC not only interpreted and intended responses to that question as essential to implementing “our BTM relocation strategy” (exhibit 5), when EDC issued the lease opportunity; this evidence also establishes that EDC relied heavily on Baldor’s response in evaluating its proposal. After the deadline on September 26, 2005, EDC quickly evaluated the proposals submitted, and, on September 27, 2005, evaluated Baldor’s lease offer as “the most competitive.” (Exhibit 10 at 2.) Of the six “strengths of Baldor’s lease offer” cited, the one most extensively discussed is Baldor’s response to the fortieth question in attachment D: “Willingness to sell or lease the company’s existing facility in Hunts Point to Bronx Terminal Market Tenants.” (Id.) Although Baldor’s current facility is on Hunts Point, its facility is not, significantly, in the “public market area,” the uses of and contributions to which are the entire focus of the lease opportunity’s goals and evaluation criteria. (Exhibit 6 at 2.) The memorandum of September 27, 2005 discusses the use and contributions of Baldor’s current facility, specifically its suitability for the BTM tenants, at least as extensively as Baldor’s use of 155 Food Center Drive, without any connection drawn between the current facility’s use or contributions and the public market area, let alone the 155 Food Center Drive “Site.” (Id.; exhibit 10 at 2.) Included in the five “Next Steps” for both 155 Food Center Drive and site C is *996 to: “Initiate conversations with the BTM tenants regarding the Baldor facility.” (Id. at 3.)
This memorandum also reviews “best and final” offers solicited for site C. (Id.) Despite Dairyland’s prior ultimatum, Dairy-land declined to respond to this solicitation. Dairyland’s unresponsiveness may have indicated that its expressed immediate need for expansion space in the public market area was not so pressing or that its threat to move precipitously out of New York City was not entirely genuine. Moreover, Dairyland “put forward a very low, uncompetitive offer” for 155 Food Center Drive, indicating that Dairyland just assumed its ultimatum would garner this site or, instead, was “already half way out the door to New Jersey.” (Exhibit 12 at 1.) In any event, EDC had an 11.8-acre alternative site to both 155 Food Center Drive and site C to offer Dairyland.
The four points in the memorandum of September 27, 2005 supporting Baldor’s willingness “to sell or lease” its current facility to the BTM tenants even include facts undisclosed in Baldor’s proposal: “The company would be willing to lease the space for around $8 - $8.50/SF, or to sell the building.” (Exhibit 6 at 2.) This memorandum predates any further exploration with Baldor of lease terms for 155 Food Center Drive. EDC immediately followed up with Baldor, however, to finalize the terms for relocating the BTM tenants as part of the terms for leasing 155 Food Center Drive. After meeting with Baldor, EDC outlined these terms in EDC’s commitment letter to Baldor (Oct. 12, 2005, exhibit 1), in EDC’s summary for its executives “of our rationale for selecting Baldor for the 155 Food Center Drive site” (Oct. 17, 2005, exhibit 15), and in EDC’s conditional designation letter to Baldor (Nov. 14, 2005, exhibit 14). Each of these communications highlights Baldor’s marketing of its current facility to the BTM tenants at the $8 figure. Finally, Mayor Bloomberg, at his press conference on December 1, 2005, announcing the award to Baldor, heralded its willingness to make its current facility available as a potential relocation site for the BTM tenants. All these communications confirm that this factor, hidden though it was, was in fact central to EDC’s and the City’s goals and evaluation criteria in awarding the lease opportunity to Baldor.
EDC’s after-the-fact determination not to abandon Baldor immediately as a potential lessee, when the BTM tenants ultimately rejected Baldor’s current facility, is hardly dispositive. Having gone so far down the road in committing to Baldor, EDC *997 might find a myriad of reasons not to turn back voluntarily, none of which is explored in the evidence. Nor is any after-the-fact rationalization relevant to EDO’s decision-making process leading up to its award. (Matter of New York State Ch., Inc., Associated Gen. Contrs. of Am. v New York State Thruway Auth., 88 NY2d 56, 75 [1996]; Matter of Madison Sq. Garden, L.P. v New York Metro. Transp. Auth., 19 AD3d 284, 287 [1st Dept 2005]; Matter of Missionary Sisters of Sacred Heart, Ill. v New York State Div. of Hous. & Community Renewal, 283 AD2d 284, 288 [1st Dept 2001].)
Although ultimately EDO’s goal may not have been realized, voluntarily reneging on the conditional designation to Baldor would only reveal the hidden agenda. Moreover, Baldor did submit a compelling proposal. The point here, however, is that, had other applicants known of the goal and been provided a reasonable response period, their proposals may have been more compelling.
E The Impact of EDO’s Interpretation and Application of the Lease Opportunity
Petitioner reasonably did not interpret the fortieth question in attachment D as seeking any particular content that EDC would weigh heavily in its evaluation. Had EDC disclosed this question’s importance to EDO’s goals and evaluation, petitioner, as well as other applicants, could have, and petitioner would have, focussed on and considered an answer that best met EDO’s goal and criterion of providing a potential relocation space for the BTM tenants. Even if it might have been difficult for petitioner to provide that space within the confines of petitioner’s current premises, petitioner may have had that capacity if awarded the expansion space at 155 Food Center Drive.
The RFP as presented is reasonably interpreted as conveying that an applicant ought to show a compelling need for the new space. Surely a showing that petitioner’s enterprises were bursting at the seams would be at least as consistent with this message as showing that petitioner had ample room. Even the buried question asking for the applicant’s proposed use for its current facility does not ask for a response that speaks directly to EDO’s concern. As indicated above, an answer, like petitioner’s, that the applicant intended to remain in its current facility, is at least as consistent with the capacity to accommodate other businesses, in the new space, as proposing to vacate a current facility.
Conceivably petitioner might have proposed such accommodation elsewhere in petitioner’s proposal. Yet again the lease op *998 portunity nowhere conveys that such accommodation would be viewed as a particularly important contribution to the public market area’s economy or means of maximizing 155 Food Center Drive’s development potential: the expressed goals and evaluation criteria.
Had EDC disclosed the importance of relocating the BTM tenants to EDC’s goals for and evaluation of lease offers for 155 Food Center Drive, petitioner could have and would have incorporated means to provide that relocation space in petitioner’s lease offer. The court credits the testimony of petitioner’s copresident, Matthew D’Arrigo, on this point, particularly as it was elicited on cross-examination. Had EDC disclosed that accommodating the BTM tenants was a component of a viable proposal: (1) he would have recommended it to the cooperative; (2) such a proposal would have been a feasible, effective plan for the cooperative; and (3) it would have embraced the concept.
Actual undisputed occurrences related by petitioner’s other copresident, Stephen Katzman, also elicited on cross-examination, support D’Arrigo’s testimony. When petitioner submitted its proposal, the cooperative already included two of the BTM tenants. During 2005, further stores in the cooperative became available for the dislocated BTM tenants. By March 2006, at least one more BTM business had opened up in the cooperative. Katzman, too, volunteered that, had EDC disclosed accommodation of the BTM tenants as a criterion for proposals that would factor in EDC’s decision making, petitioner could have given those businesses due consideration in petitioner’s proposal.
G. The Contributing Impact of the Seven-Day Deadline
Since all Baldor had to do to meet EDC’s priority concern of dealing with the BTM tenants’ relocation in its disposition of 155 Food Center Drive was to answer the questionnaire with basic descriptive information about Baldor’s operations that EDC already knew, the seven-day deadline did not constrain the key competitive feature of Baldor’s proposal. The competitive ability of petitioner, understandably unaware a particular answer to attachment D’s fortieth question or an emphasis or elaboration on that answer up front in the proposal, contrary to the goals and criteria the RFP emphasized and elaborated on, would give an applicant a competitive edge, was constrained. In fact the RFP’s format conveyed that no particular answer to this question, unlike other elements of the RFI^ was better or worse.
*999 Even had petitioner read this question’s hidden message or otherwise ascertained that a particular answer would lend a competitive edge, the collapsed time frame still imposed greater constraints on petitioner than on the applicants whom EDO knew would give the answer sought, by describing their basic operations. As set forth above, petitioner needed to be more creative. In particular, the court credits Matthew D’Arrigo’s testimony on cross-examination that, if simply given adequate time to develop petitioner’s proposal fully, petitioner could have included new businesses from the BTM as part of the proposal and as cooperative members.
That disadvantage alone would not be fatal to the lease opportunity, but, here, reading the hidden message was neither a reasonable reading nor petitioner’s reading of attachment D’s fortieth question. Moreover, EDO’s nondisclosure of this question’s importance to EDO’s goals and evaluation, compounded by its short deadline, did not merely stifle petitioner’s adept consideration of this question and deliberation over its best answer. EDO’s unprecedented seven-day deadline severely constrained petitioner’s ability to compensate for being in the dark, by enhancing the competitiveness of its proposal’s other features. Any applicant, like petitioner, seeking to use both parcels offered at 155 Food Center Drive or to undertake full-scale construction on or development of either parcel, uses the lease opportunity nowhere discouraged, first needed to digest reams of environmental and engineering data included with the lease opportunity. (Exhibits 20, KK.) The applicant then needed to untangle the complex environmental and engineering issues presented. A competitive proposal in these respects required expertise not ordinarily available on food businesses’ staff, but available instead through the retention of consultants. Thus the seven-day, flve-business-day deadline discouraged a competitive proposal from petitioner and other applicants that might in fact “maximize the full development potential of all. . . of the Site,” as was “strongly encouraged.” (Exhibit 6 at 2.)
Finally, EDO’s reasons for its unprecedented short response time, even if permissible public purposes, favored two applicants. First, it enabled EDO to make a decision about reletting 155 Food Center Drive by September 30, 2005. While keeping Dairyland in New York City was a legitimate public purpose, and EDO could have dealt solely with Dairyland to achieve that purpose, the deadline was to meet Dairyland’s needs when EDO chose to open its dealings to all comers. Even to meet Dairy- *1000 land’s needs, the deadline was unnecessarily collapsed. If a decision was needed by the end of September 2005, and EDC was able to make a decision within a day after the September 26 deadline, then EDC could have extended the deadline to at least September 29 or 30, as no evidence indicates Dairyland would have acted immediately on its September 30 ultimatum, particularly with its proposal for 155 Food Center Drive pending.
A longer response time, however, would have encouraged more competitive proposals that would be difficult to reject, but that would require EDC to find a way to reject if they failed to offer a relocation alternative for the BTM tenants, EDC’s further concern. Again, their relocation was a legitimate public purpose. Nevertheless, when EDC failed to disclose it as a purpose or evaluation criterion, both intended and then used for the lease opportunity, open to all comers, it favored only those applicants, Baldor and Dairyland, that automatically satisfied this purpose without considering it or deliberating on means to satisfy it.
Conceivably EDC might have satisfied this purpose by awarding 155 Food Center Drive directly to the BTM tenants. By selecting Baldor or Dairyland, however, EDC could achieve this purpose and separately reap the benefits of a long-term lease at 155 Food Center Drive, once again a permissible purpose, had EDC disclosed it to all applicants.
H. Collusion
While the documentary evidence and credible testimony, as set forth above, amply compel the court’s finding that EDC’s award was irrational and arbitrary, a further troubling revelation emerges. Respondents offered no logical or credible explanation how EDC’s memorandum of September 27, 2005 (exhibit 10) could recite that Baldor was willing to lease its current facility to the BTM tenants for $8 to $8.50 per square foot, when Baldor’s proposal mentioned no such figure, and EDC had not yet initiated any follow-up discussions of the proposal. The only plausible explanation is that EDC or other city officials or employees had communicated with Baldor before submission of the proposals due September 26, 2005 concerning Baldor’s willingness to make its current facility available for the BTM tenants’ relocation.
Other evidence supports this finding. After all, during August 2005, as an outgrowth of the site C process, EDC had communicated with Baldor and Dairyland, which also would have vacated its current facility if awarded 155 Food Center Drive, *1001 concerning EDO’s plans for that site, both through EDO’s realtor and through EDO’s staff. Baldor, like Dairyland, also sought to deal directly and exclusively with EDO regarding its reletting of the A&P site after A&P abandoned subletting the site. Baldor’s chief executive officer Kevin Murphy acknowledged that he knew in August 2005 that the City was concerned about relocating the BTM tenants. Baldor engaged its lobbyist Kevin McGrath specifically to communicate to EDO that, if Baldor were to acquire the A&P site, Baldor could make its current headquarters available for the City’s purposes. McGrath then communicated repeatedly with EDO in late August and early September 2005, by telephone and in writing. Confirming a prior telephone conversation with EDC, McGrath wrote it a short letter. Of its two substantive sentences, one, in a separate paragraph, sought a meeting “to discuss the many possibilities available to both The City of New York and Baldor with reference to its present headquarters and the A&P sites.” (Exhibit 32.) While each of these findings is a permissible activity and relatively innocuous by itself, together they confirm the inexorable revelation in the memorandum of September 27, 2005.
Yet there is more: in the second paragraph of Baldor’s cover letter accompanying its proposal for the 155 Food Center Drive “Property” (exhibit 7 at 2) it states: “Based on preliminary conversations, we believe our building is capable of meeting the requirements of some of the major vendors of the Bronx Terminal Market who would be affected by the expansion of Yankee Stadium. We would pursue those discussions in conjunction with our relocation to the Property.” (Id. [emphases added].) Again, while Baldor well could have suggested on its own its building’s capacity to meet major BTM vendors’ needs, the sequential references to “preliminary conversations” and pursuing “those discussions” compellingly reveal otherwise. In the face of McGrath’s credible testimony, Baldor’s own documents, and the other credible testimony and documentary evidence, Baldor’s insistence, through Kevin Murphy and its president Michael Muzyk, that the “preliminary conversations” and “those discussions” were only internal lacks credibility. Too much evidence points to the contrary. There simply would be no point in referring to prior conversations or continued discussions if they were internal. Although conceivably they might have been with the BTM tenants themselves, neither the Baldor witnesses nor any other evidence so suggests.
The testimony of EDO’s realtor, Gary Curry, who discussed 155 Food Center Drive’s disposition with Baldor, was unrespon *1002 sive, evasive, and less than forthcoming throughout. Therefore the court assigns no credence to his answers regarding those discussions’ specific contents. Muzyk’s disavowal of any contact whatsoever between Baldor and EDC concerning 155 Food Center Drive before submission of Baldor’s proposal, in the face of all the prior contrary documentary evidence and testimony, by both his superior Kevin Murphy and others, combined with Muzyk’s overconfident demeanor while testifying, depletes all his testimony of credibility.
Finally, Kevin Murphy’s inconsistent testimony regarding the extent to which Baldor would compete with petitioner, were Baldor at 155 Food Center Drive, compared to Baldor’s current operations, and compared to other businesses adjacent to petitioner, while immaterial to petitioner’s first claim, was critical to its second claim. His inexplicable testimony on this material issue, in light of all the other evidence on this issue, casts further doubt on his explanation of the “preliminary conversations” and “those discussions.”
In sum, through conversations or discussions between EDC or city representatives and Baldor representatives, Baldor gained an understanding as to the significance of the BTM tenants’ relocation for the City and EDC, not just as a public issue, but specifically its central significance in the context of 155 Food Center Drive’s disposition. This mutual understanding emerged before EDC issued the lease opportunity and was undisclosed to other applicants for that site, including petitioner.
III. EDC’s Decision-Making Process Was Irrational, Arbitrary, and Unfair and Therefore Unlawful
A. Application of the Requisite Standards
Petitioner bears the burden to show that EDC’s determination to award 155 Food Center Drive to Baldor was irrational, arbitrary, or otherwise unlawful to overcome “the presumption of regularity” that attaches to official action. (Matter of Altamore v Barrios-Paoli, 90 NY2d 378, 386 [1997]; Matter of Ensley v New York City Dept. of City-Wide Admin. Servs., 259 AD2d 286, 287 [1st Dept 1999]; see Matter of Conduit & Found. Corp. v Metropolitan Transp. Auth., 66 NY2d 144, 149 [1985]; Matter of Grossman v Rankin, 43 NY2d 493, 502 [1977]; Matter of Allen Group [Allen Testproducts Div.] v Adduci, 123 AD2d 91, 95 [3d Dept 1987].) Where the record shows reasonable and fair ground for different conclusions by administrative officials, their determination must stand, even though the court may differ as to whether they made the wisest determination and may reach a *1003 different conclusion. (Grossman v Rankin, 43 NY2d at 503, 505-506; Allen Group v Adduci, 123 AD2d at 95; Goldwin-Kent, Inc. v County of Broome, 107 Misc 2d 722, 731 [Sup Ct, Broome County 1981].) In sum, the court may not substitute its judgment for an intelligent and conscientious judgment by EDC. (Grossman v Rankin, 43 NY2d at 503-504; Allen Group v Adduci, 123 AD2d at 95; Matter of Surdell v City of Oswego, 91 Misc 2d 1041, 1045 [Sup Ct, Oswego County 1977].)
The evidence adduced uncovered the basis for EDC’s administrative action and showed that a principal criterion on which EDC rested its determination found no rational basis in the lease opportunity EDC published to any interested applicant. (See Grossman v Rankin, 43 NY2d at 503.) This examination of EDC’s decision-making process was necessary for the court to carry out its responsibility in ensuring that that process was rational and fair. (New York State Ch., Inc., Associated Gen. Contrs. of Am. v New York State Thruway Auth., 88 NY2d at 69; see Grossman v Rankin, 43 NY2d at 506; Goldwin-Kent, Inc. v County of Broome, 107 Misc 2d at 731.)
Although EDC’s disposition of 155 Food Center Drive was a process that EDC was permitted to complete quickly and to target to a particular category of potential tenants, the process unquestionably was not the model of transparency and even-handedness befitting a public agency. EDC’s actions would have been entirely lawful, rational, and within its permissible discretion had EDC openly targeted its lease offer to an applicant that could free up its current space if awarded the lease, or had EDC awarded the lease to such a tenant without opening the process to anyone else; however, EDC did not choose either procedure. (Matter of Feldman v Miller, 151 AD2d 755, 756 [2d Dept 1989]; Fur-Lex Realty v Lindsay, 81 Misc 2d 904, 908-909 [Sup Ct, NY County 1975].)
Thus, while EDC was not required to open its process to any applicant, once EDC did so, it was required to treat all applicants fairly. (Madison Sq. Garden, L.P. v New York Metro. Transp. Auth., 19 AD3d at 286; Matter of Tri-State Aggregates Corp. v Metropolitan Transp. Auth., 108 AD2d 645, 646 [1st Dept 1985].) Of course a “restriction upon the use to which property may be put will inevitably result in similarly restricting the class of interested bidders.” (Fur-Lex Realty v Lindsay, 81 Misc 2d at 909; see New York State Ch., Inc., Associated Gen. Contrs. of Am. v New York State Thruway Auth., 88 NY2d at 67-68, 71.) Nonetheless, EDC’s determination to award the prop *1004 erty may not be arbitrary and thus must be rationally based on the standards, however restrictive, articulated in the RFP that advertised the lease opportunity to the public. (Id. at 68; Madison Sq. Garden, L.P. v New York Metro. Transp. Auth., 19 AD3d at 287; Matter of Ensley v New York City Dept. of City-Wide Admin. Servs., 259 AD2d 286 [1999].) While EDC was unconstrained by competitive bidding statutes that would require it to “spell out every single factor” EDC would consider, and its final lease need not rigidly conform to the lease opportunity, EDO’s determination still must be rationally related to and within the scope of the published lease opportunity. (Madison Sq. Garden, L.P. v New York Metro. Transp. Auth., 19 AD3d at 286; see New York State Ch., Inc., Associated Gen. Contrs. of Am. v New York State Thruway Auth., 88 NY2d at 68; Orelli v Ambro, 41 NY2d 952, 953 [1977]; Matter of O’Henry’s Film Works v Bureau of Ferry & Gen. Aviation Operations, 111 Misc 2d 464, 468-469 [Sup Ct, NY County 1981].)
As detailed above, EDO’s principal consideration in making its determination finds no support in the lease opportunity’s text. Thus, even viewed flexibly, this basis for the determination bears no relation to and falls outside the scope of the lease opportunity’s expressed goals and criteria. (Madison Sq. Garden, L.P. v New York Metro. Transp. Auth., 19 AD3d at 286; see New York State Ch., Inc., Associated Gen. Contrs. of Am. v New York State Thruway Auth., 88 NY2d at 75; Orelli v Ambro, 41 NY2d at 953.)
Even had EDC not interpreted and intended the lease opportunity as a means to implement “our BTM relocation strategy” (exhibit 5) at the outset, but only relied on Baldor’s interjection of that objective in EDC’s evaluation of proposals, the undisclosed reliance on that criterion still would have been unlawful. That reliance favored Baldor (see Feldman v Miller, 151 AD2d at 756), and was unfair to other applicants as well as the public. (Square Parking Sys. v Metropolitan Transp. Auth., 92 AD2d 782, 784-785 [1st Dept 1983]; see Conduit & Found. Corp. v Metropolitan Transp. Auth., 66 NY2d at 148.)
The reason is simple. EDC is required to secure a lessee on terms most beneficial to the public. (New York State Ch., Inc., Associated Gen. Contrs. of Am. v New York State Thruway Auth., 88 NY2d at 68; Orelli v Ambro, 41 NY2d at 953; Creole Enters. v Giuliani, 236 AD2d 272 [1st Dept 1997]; Feldman v Miller, 151 AD2d at 755-756; see Conduit & Found. Corp. v Metropolitan Transp. Auth., 66 NY2d at 148.) When applicants remain *1005 uninformed of a key factor in EDO’s decision making, EDO denies itself and consequently the public the benefit of all applicants’ best proposals after their consideration of this key factor. This result is as contrary to the public interest as an award intentionally steered to a particular applicant. (See id. at 148-149; Fur-Lex Realty v Lindsay, 81 Misc 2d at 909-910.) This result is precisely what ensued here.
B. Consistency with the Governing Public Purposes
While EDO was not required to engage in any competitive process, and the competitive process EDO chose was not subject to specific, unbending statutory requirements, the central purposes of EDO’s REP process and statutorily-required competitive bidding are comparable. They are to protect public revenue by obtaining the best use of public property on the best terms, to foster honest, fair competition toward that end, and to prevent irrationality, arbitrariness, favoritism, and corruption in awarding a lease to the property. (New York State Ch., Inc., Associated Gen. Contrs. of Am. v New York State Thruway Auth., 88 NY2d at 68; Conduit & Found. Corp. v Metropolitan Transp. Auth., 66 NY2d at 148; Matter of Transactive Corp. v New York State Dept. of Social Servs., 236 AD2d 48, 52 [3d Dept 1997], affd 92 NY2d 579, 587 [1998]; Creole Enters. v Giuliani, 236 AD2d 272 [1997].) Because the public is the intended beneficiary of these purposes, petitioner’s challenge to the award must be consistent with the public interest. (Conduit & Found. Corp. v Metropolitan Transp. Auth., 66 NY2d at 148; Transactive Corp. v New York State Dept. of Social Servs., 236 AD2d at 52.)
An REP satisfies these purposes if it sets forth “the general evaluation criteria” and indicates their significance to the proposals’ evaluation. (Id. at 53; see Matter of Browning-Ferris Indus. of N.Y. v City of Lackawanna, 204 AD2d 1047, 1048 [4th Dept 1994]; Matter of Amdahl Corp. v New York State Higher Educ. Servs. Corp., 203 AD2d 792, 794 [3d Dept 1994].) The REP need not list all the specific factors that may be used in the evaluation, as long as they are subsumed within the “general criteria” distributed to applicants (Transactive Corp. v New York State Dept. of Social Servs., 236 AD2d at 53), do not depart from the original specifications (id. at 54; Browning-Ferris Indus. of N.Y. v City of Lackawanna, 204 AD2d at 1048), and enable applicants to interpret the REP intelligently and submit proposals that conform to the criteria to be used. (Id.; O’Henry’s Film Works v Bureau of Ferry & Gen. Aviation Operations, 111 Misc 2d at 469.)
*1006 Here, the RFP nowhere disclosed an evaluation criterion that encompassed the relocation of BTM tenants or the provision of space outside the public market area to other businesses. Yet these factors formed a principal basis for EDO’s award to Baldor. (See New York State Ch., Inc., Associated Gen. Contrs. of Am. v New York State Thruway Auth., 88 NY2d at 74-75.)
Whether EDO intended to favor Baldor specifically or any applicant that provided the potential relocation space, or Baldor knew EDO would rely on this publicly undisclosed criterion, is not necessarily determinative. That intent or mutual understanding would show favoritism, to be sure, or even corruption. Nonetheless, the inequitable impact of not affording other applicants “an equal opportunity to compete” based on that criterion (Matter of Progressive Dietary Consultants of N.Y. v Wyoming County, 90 AD2d 214, 218-219 [4th Dept 1982]) still placed Baldor at an “unfair advantage” (Transactive Corp. v New York State Dept. of Social Servs., 236 AD2d at 53; Browning-Ferris Indus. of N.Y. v City of Lackawanna, 204 AD2d at 1048) “at the other bidders’ expense,” amounting to favoritism. (Transactive Corp. v New York State Dept. of Social Servs., 236 AD2d at 53; see Square Parking Sys. v Metropolitan Transp. Auth., 92 AD2d at 784; Feldman v Miller, 151 AD2d at 756; Allen Group v Adduci, 123 AD2d at 95.) The substantial departure from the announced public standards “changed the rules” after the contest (Progressive Dietary Consultants of N.Y. v Wyoming County, 90 AD2d at 217), and “undermined the fairness of the competition.” (Transactive Corp. v New York State Dept. of Social Servs., 236 AD2d at 54; see Conduit & Found. Corp. v Metropolitan Transp. Auth., 66 NY2d at 148.) More fundamentally, the absence of a rational relationship between the RFP and a principal basis for the award produced an irrationally-based and arbitrary award “contrary to law.” (Browning-Ferris Indus. of N.Y. v City of Lackawanna, 204 AD2d at 1048; see Conduit & Found. Corp. v Metropolitan Transp. Auth., 66 NY2d at 149; Transactive Corp. v New York State Dept. of Social Servs., 236 AD2d at 54; Amdahl Corp. v New York State Higher Educ. Servs. Corp., 203 AD2d at 794.)
Most fundamentally and importantly, by excluding applicants from notice of a key decision-making criterion and the opportunity to submit proposals to meet this criterion, especially when it is a valid public purpose, EDC excluded itself and the public from the best possible proposals to meet that purpose *1007 and. thus confer the greatest public benefit. (Conduit & Found. Corp. v Metropolitan Transp. Auth., 66 NY2d at 148-149; Orelli v Ambro, 41 NY2d at 953; Square Parking Sys. v Metropolitan Transp. Auth., 92 AD2d at 785; Feldman v Miller, 151 AD2d at 755-756.) This result is undeniably contrary to the purposes of any public solicitation of competitive proposals.
C. Standing
Petitioner also must show it suffered actual injury that is distinct from the public interest and falls within the interests the challenged procedure is designed to protect. (Transactive Corp. v New York State Dept. of Social Servs., 92 NY2d at 587; Society of Plastics Indus. v County of Suffolk, 77 NY2d 761, 772-774 [1991]; Matter of Dairylea Coop. v Walkley, 38 NY2d 6, 9 [1975].) Here, petitioner had a direct stake in the outcome of the lease opportunity process. By submitting a proposal and participating in the lease opportunity process, petitioner sought the economic benefits of a long-term lease to 155 Food Center Drive. No evidence suggests petitioner did not have the capacity to be a permissible applicant for and tenant of the site. When the outcome was an award to another applicant, petitioner lost the opportunity for the lease and its economic benefits. (Transactive Corp. v New York State Dept. of Social Servs., 92 NY2d at 587; Altamore v Barrios-Paoli, 90 NY2d at 384; Dairylea Coop. v Walkley, 38 NY2d at 9.)
The purpose of EDC’s RFP process was to ensure equitable decision-making procedures. When EDC undertook to engage in that process, it was to promote the most “responsive and responsible” proposals based on the standards articulated in the RFP, to make a decision based on the same standards, and thus to promote the public interest. (Transactive Corp. v New York State Dept. of Social Servs., 92 NY2d at 587; see Amdahl Corp. v New York State Higher Educ. Servs. Corp., 203 AD2d at 794.) Petitioner’s first claim strikes at the heart of that purpose.
IV Relief
When the court issued a temporary restraining order (TRO) on April 6, 2006, it relied primarily on the seven-day response period’s unfair impact on applicants less familiar with 155 Food Center Drive and EDC’s objectives versus applicants more familiar through prior dealings. The court did not rely primarily on EDC’s objective of using 155 Food Center Drive’s disposition to facilitate relocation of the BTM tenants. The court waited to ascertain further, through respondents’ evidence, whether Bal *1008 dor or other individual applicants had received information about this objective from EDC.
Despite efforts to rebut the primary basis for the TRO, respondents’ evidence has failed to justify EDC’s method of achieving its objective for the BTM tenants through the lease opportunity for 155 Food Center Drive. The weight of the evidence that has emerged points distinctly toward Baldor’s prior mutual understanding as to the central significance of the BTM tenants’ relocation for the City and EDC in the context of 155 Food Center Drive’s disposition. Although respondents denied communications about this objective, the contradictions in the evidence, both related and unrelated to this precise issue, make those denials incredible. Without the evidence of communications producing a mutual understanding, however, the full picture from all the remaining evidence, parsing through the lease opportunity itself and the correspondence surrounding it, establishes that EDC’s lease opportunity failed to disclose a central criterion on which EDC intended to base its lease award and did base the award.
This irrational basis for the award, its consequent arbitrariness, and its unfair impact, favoring Baldor, and disadvantaging other applicants including petitioner, is enough to annul the award. The compounding effect of the unprecedented seven-day, five-business-day, response time for applicants and the collusion between EDC and Baldor, however benign their motives, only heightens the irrationality, arbitrariness, unfairness, and favoritism.
On these grounds petitioner has sustained its burden to show that EDC’s determination to award 155 Food Center Drive to Baldor was irrational, arbitrary, and unlawful. (CPLR 7803 [3].) Petitioner has sustained its further burden to show that the challenged lease opportunity procedure caused petitioner the precise injury this public procedure was supposed to protect against, had it been undertaken and implemented rationally, fairly, and lawfully.
The court is persuaded that EDC’s and Baldor’s public and business purposes are valid and that EDC is capable of undertaking a disposition of the valuable property at 155 Food Center Drive rationally, fairly, and lawfully. Consequently, the court grants relief on petitioner’s first claim as follows.
The conditional designation on November 14, 2005 of respondent Baldor Specialty Foods, Inc., as the lessee of 155 Food Center Drive, Bronx County, and any prior and subsequent ac *1009 tions by respondents EDC and EDC President Andrew Alper awarding the lease for 155 Food Center Drive to Baldor are annulled, void, and without effect. (CPLR 7803 [3]; 7806.) The court enjoins these respondents and respondent City of New York from entering into a lease for 155 Food Center Drive until EDC or the City has undertaken and implemented a new procedure for these premises’ disposition and the selection of a lessee, permittee, occupant, or purchaser, consistent with this decision. (CPLR 7806; e.g., Browning-Ferris Indus. of N.Y. v City of Lackawanna, 204 AD2d at 1048; O’Henry’s Film Works v Bureau of Ferry & Gen. Aviation Operations, 111 Misc 2d at 469.)
Because of the potential for retaliation against participants in this proceeding, any future offer of these premises must exclude neither petitioner, nor its witnesses, nor Baldor, among the potential lessees, permittees, occupants, or purchasers to whom the opportunity to acquire or occupy the premises is offered. If EDC and the City are to realize the maximum public benefit from the premises’ disposition, as is EDC’s mandate, EDC must allow applicants for these premises a reasonable period to submit proposals that will set forth the best ways to meet that goal, consistent with any need for a speedy process to realize maximum public benefit. (Matter of McArdle v Board of Estimate of City of Mt. Vernon, 74 Misc 2d 1014, 1018-1019 [Sup Ct, Westchester County 1973], affd 45 AD2d 822 [1974].) Once EDC or the City engages in any type of competitive proposal process, it is in the public interest to encourage the best proposals. An unnecessarily short response period thwarts that overriding purpose of benefitting the public. (Conduit & Found. Corp. v Metropolitan Transp. Auth., 66 NY2d at 148-149.) The period also must be adequate to negate any advantage from the information gained during this proceeding by its participants.
EDC and the City need not undertake any disposition or selection process at all. If they do, however, the facts found and reasons cited above justify this minimal intrusion on respondents’ decision-making process, to provide basic protections for its reasonableness and fairness and for the public interest. (Grossman v Rankin, 43 NY2d at 506; Browning-Ferris Indus. of N.Y. v City of Lackawanna, 204 AD2d at 1048; McArdle v Board of Estimate of City of Mt. Vernon, 74 Misc 2d at 1018-1019, affd 45 AD2d 822 [1974]; O’Henry’s Film Works v Bureau of Ferry & Gen. Aviation Operations, 111 Misc 2d at 469.)
*1010 This decision constitutes the court’s final order and judgment granting the relief sought by petitioner’s first cause of action. (Amended verified petition ¶ 83; CPLR 411, 7806.) In light of this decision, the court vacates its order of April 6, 2006 requiring an undertaking. (CPLR 6313 [c].) A decision on petitioner’s remaining claims and the pending motions will follow.