NEW COLONIAL ICE CO., INC., Plaintiff, *v.* DANIEL P. WOOLLEY, as Commissioner of Public Markets of the City of New York, et al., Defendants.

Supreme Court, Special Term, New York County, May 5, 1943.

474

*Joseph Sterling* and *Joseph Gershman* for plaintiff.

*Thomas D. Thacher, Corporation Counsel (Julius Isaacs, Charles Bisberg* and *William A. Marks* of counsel), for Daniel P. Woolley, as Commissioner of Public Markets of the City of New York, and another, defendants.

*Joseph A. Boccia* for Frank Tursellino, defendant.

PECORA, J. Plaintiff brings this action as a taxpayer under section 51 of the General Municipal Law to enjoin defendant Woolley, as Commissioner of Public Markets (hereinafter referred to as Commissioner) and the City of New York from carrying out the terms of a lease covering the ice plant in the power-house building in the Bronx Terminal Market. Plaintiff seeks further to restrain the lessee, the defendant Tursellino, from operating the demised premises for the manufacture and sale of ice, and asks for a decree adjudging the lease to be null and void and in violation of the New York City Charter (1938) and the Agriculture and Markets Law. Finally, plaintiff asks that defendant Tursellino be compelled to account to the City of New York for profits earned by him in the use and occupation of the plant.

Soon after defendant Woolley was appointed as Commissioner of Public Markets on January 26, 1942, he ascertained from a survey made for him that the ice plant in the power house of the Bronx Terminal Market had been idle for about fifteen years, and that it could be put in operation at a total cost to the City of about $31,000 per annum. It thus appeared that if the plant could be rented for more than that sum, the excess would represent a profit to the City. The Commissioner thereupon leased the ice plant and its equipment to defendant Tursellino for a term of one year, commencing May 15, 1942, with an option of renewal for an additional two-year period. The rent reserved was $40,000 per annum for the first year plus water charges, and as to any renewal the rental was to be agreed upon between the tenant and the Commissioner. Failing such agreement the rental was to be fixed by the Mayor whose determination was to be binding upon the parties. Under the lease, the City further agreed to furnish the tenant with such electricity as the tenant needed in the conduct of the ice business at the leased premises, but the tenant agreed to pay for all electric current so furnished to him in excess of $28,000 per year.

As was said in *Campbell* v. *City of New York* (244 N. Y. 317, 328) respecting taxpayers' actions, " Their right of action as taxpayers is measured by the statute (General Municipal Law, § 51). They must show an illegal act or waste of public property. * * * Another form of contract might be more expedient or cheaper. The courts do not sit in judgment upon questions of legislative policy or administrative discretion. The taxpayer must point to illegality or fraud."

Plaintiff attacks the legality of the lease upon the ground that the Commissioner had no power to assume the responsibilities provided in the lease, and that in any event there could be no lease of the ice plant without competitive bidding. It is true that section 384 of the New York City Charter (1938) provides that no real property of the City may be leased except with the approval of the Board of Estimate " *unless such power is expressly vested by law in another agency.*" (Italics supplied.) That section further provides that " *Except as otherwise specifically provided by law,*" the disposition of the property must be by competitive bidding. However, section 833 of the Charter gives to the Commissioner of Markets all the powers of a commissioner of public markets under the Agriculture and Markets Law, with the exception of the construction and repair of structures, which duties are to be performed by the Department of Public Works.

Under section 261 of the Agriculture and Markets Law, the Commissioner of Markets is vested with the power of the maintenance and management of all public markets and of all buildings, structures and facilities thereon. In subdivision 2 of said section, the Commissioner is given the power " Of fixing fees for services, licenses and privileges and of renting space therein and entering into leases therefor ". We find here, then, an exception specifically provided by law which removes leases of market property from the restrictions of section 384 of the Charter. Thus the Commissioner of Markets, and not the Board of Estimate, has the power to enter into leases of property in public markets. There is no requirement for public letting contained in section 261 except in subdivision 7 thereof. That subdivision was added by chapter 485 of the Laws of 1933. It is clear that it was passed to give power to lease the entire Bronx Terminal Market as one unit, and has no application to situations such as are presented in the instant litigation.

Furthermore, under rule 1 of the Rules and Regulations for the Bronx Terminal Market, approved by the Board of Estimate on October 9, 1939, the Commissioner of Markets is authorized to make leases of space and buildings in the Terminal Market for periods from one to ten years. There is no provision for public letting in said Rules and Regulations. It follows that if approval of the Board of Estimate were necessary it could be spelled out from the provisions of the Rules and Regulations governing the Bronx Terminal Market.

Plaintiff urges that the lease is illegal because the property leased was not rented for a market purpose, i. e., that the manu-

facture of ice is not a market purpose. Section 259 of the Agriculture and Markets Law, in defining a market, does not purport to describe what products are to be sold in a public market. The definition is solely for the purpose of indicating what property should come within the jurisdiction of a commissioner of markets. The power house involved herein is unquestionably a physical part of the Bronx Terminal Market. In fact it is an important part of the market, since it furnishes refrigeration to the storage warehouse and all other buildings in the Bronx Terminal Market. This court is of the opinion that the manufacture of ice serves " some public or quasi-public market purpose ". (*Eith* v. *City of New York*, 165 Misc. 18, 28.) Different types of related businesses must be contained within the area of a large public market. For example, in the Bronx Terminal Market there are now a restaurant, a burlap-bag business, a dormitory, a milk-pasteurization plant, et cetera. In *Grill* v. *City of New York* (N. Y. L. J. April 28, 1939, p. 1956, affd. 258 App. Div. 793; revd. on other grounds 282 N. Y. 471), it was held that the leasing of a building in Wallabout Market for a paper and twine business was for a proper market purpose. The case of *Bird* v. *Grout* (106 App. Div. 159) is not applicable here. There are no restrictions with respect to the Bronx Terminal Market comparable to the limitations contained in the deed conveying the Wallabout Market property to the City of Brooklyn. That case turned upon the restrictions contained in the deed of the market grounds, as well as the probable violation of the Sanitary Code. Furthermore, it was decided long before the enactment of section 261 of the Agriculture and Markets Law, which defines the powers of a Commissioner of Public Markets.

Another specification of illegality presented by plaintiff is that the City is selling electric power in furtherance of a commercial enterprise. The evidence shows that the City operates the refrigeration and ice-making machines, and that the City furnishes such refrigeration to the lessee as well as to other merchants in the market. The cost of such power consumed in furnishing the refrigeration service to the lessee was, under the terms of the lease, not to exceed $28,000. If it did, the tenant was to pay any additional cost. The evidence was convincing that there was a definite basis upon which the cost of the power consumed by the City in furnishing refrigeration to the tenant could be ascertained. If plaintiff's contention with respect to the furnishing of power could be sustained, then it would follow that the City could never undertake to supply

any tenant in the market with any service which involved the use of electricity, such as elevator service, refrigeration service, heat, et cetera. There seems to be no reason why a city may not, like any other landlord, furnish electric power to tenants in connection with a lease of city-owned premises. The instant lease is not a sale of electric power. Even though the cost of the power used represents a large portion of the rental, nevertheless it is still an incident of the lease. If the City can contract to lease the ice plant, it must be held that it has the power to make provision for furnishing the facilities that are incidental to the use of the demised premises.

Finally, I can find no adequate basis for the claim that the City under the disguise of " refrigeration services " is engaged in manufacturing ice for the defendant Tursellino. The proof establishes that City employees perform certain duties in connection with the operation of the machines which manufacture refrigeration. These machines manufacture refrigeration not only for the tenant of the ice plant, but for all of the City's tenants in the market. It can no more be said that these employees perform work for this tenant than it can be said that they are employed by any other of the City's tenants in the market who are provided with refrigeration under their respective leases.

Before entering into the lease in question, the Commissioner obtained the advice of the Corporation Counsel as to its legality. It has been pointed out to the court that in 1929 and in 1932 the Corporation Counsel advised the Commissioner of Public Markets that he had no power to lease the section of the powerhouse building to an independent company for the manufacture of ice. The court is, of course, not precluded by either of these opinions. Nor have they any binding effect upon the City. Errors of law committed by city employees and officers do not estop the city. (*City of New York* v. *Wilson & Co.*, 278 N. Y. 86, 99; *New York City Employees' Retirement System* v. *Eliot*, 267 N. Y. 193; *N. Y. Telephone Co.* v. *Board of Education of City of Elmira*, 270 N. Y. 111.)

Since plaintiff has not shown any illegal act the questions of waste or lack of good business judgment on the part of the Commissioner become immaterial. There is no charge of fraud here. Nor does the evidence demonstrate any waste. On the contrary, it shows that the Commissioner took a plant, idle for almost fifteen years, which was rotting away, and by leasing it, restored it to proper operating condition, resulting in a net profit to the City of almost $15,000 per annum.

In view of the disposition made herein, it is unnecessary to discuss the question of whether plaintiff comes into equity with clean hands. There is evidence that plaintiff is a member of the Bronx Ice Associates, an organization consisting of about 80% of the ice manufacturers in The Bronx, Harlem and Upper Manhattan. The defendants argue that this action is brought for the purpose of eliminating a competitor. The defendants' contention that this organization was formed as a combination to fix prices has much force. Since, however, I have found that the Commissioner had the power to execute the lease in suit, I shall make no findings upon the question of plaintiff's motives in bringing the action.

The defendants are granted judgment dismissing the complaint, with costs. Submit findings and decree accordingly.