[706 NE2d 1180, 684 NYS2d 156]

In the Matter of TRANSACTIVE CORPORATION, Appellant, v NEW YORK STATE DEPARTMENT OF SOCIAL SERVICES et al., Respondents. (Proceeding No. 1.)

In the Matter of CHECK CASHERS ASSOCIATION OF NEW YORK, INC., et al., Appellants, v NEW YORK STATE DEPARTMENT OF SOCIAL SERVICES et al., Respondents. (Proceeding No. 2.) (And Another Related Proceeding.)

Argued October 13, 1998; decided December 3, 1998

**POINTS OF COUNSEL**

*McNamee, Lochner, Titus & Williams, P. C.,* Albany (*David J. Wukitsch* of counsel), for appellant in the first above-entitled proceeding.

*Bond Schoeneck & King, L. L. P.,* Albany (*Hermes Fernandez* of counsel), and *Winne, Banta, Rizzi, Hetherington & Basralian, P. C.,* New York City (*Gerald Goldman* of counsel), for appellants in the second above-entitled proceeding.

*Dennis C. Vacco, Attorney-General,* Albany (*Michael S. Buskus, Barbara G. Billet* and *Peter H. Schiff* of counsel), for New York State Department of Social Services and another, respondents in the first and second above-entitled proceedings.

584

**OPINION OF THE COURT**

SMITH, J.

Following a competitive bidding process, the New York State Department of Social Services (DSS) awarded a contract to respondent Citicorp Services, Inc. to create and implement a new system for the distribution of public assistance benefits including food stamps, Aid to Families with Dependent Children (AFDC) payments and Supplemental Security Income (SSI) benefits. Through this new service—known as an electronic benefit transfer system (EBTS)—benefits would be transferred in a more efficient and cost-effective manner.

This appeal challenges the award of an EBTS contract to Citicorp on the basis of an alleged defective bidding process. Petitioners-appellants are Transactive Corporation, a subcontractor of Fleet Financial Group, Inc., a bidder on the project; Check Cashers, Inc., a trade association, joined by several local

check cashing institutions (collectively "Check Cashers"); and Silvia Rivera, a New York benefits recipient and taxpayer. We conclude that none of the petitioners has standing to contest the award of the contract, and affirm the order of the Appellate Division, but on different grounds.

On April 6, 1995 seven States, identified as the Northeast Coalition of States,[1] entered into a Memorandum of Understanding to research, investigate, design and develop an EBTS. None of these States was obligated by the Memorandum to enter into an EBTS. Each State, however, was free to contract with a bidder for the establishment of such a system. In June 1995, New York State (as represented by DSS), joined the other States in issuing a request for proposals (RFP) and solicited offers to develop and implement a regional EBTS that would distribute social service benefits to millions of recipients of benefits in each of the seven States. The EBTS allows recipients to access their government benefits electronically by using plastic access card technology at automated teller machines and point-of-sale terminals. The EBTS technology would replace the current system whereby government benefits are distributed, in some areas, by individual attendants at local "check cashing" institutions. The State pays these "check cashers" approximately $6 per month per benefit recipient for this service. The cost savings of the EBT system is expected to total several million dollars over the life of the system.

The RFP, released on June 22, 1995, notified bidders that all proposals would be reviewed by a Technical Evaluation Committee and a Financial Evaluation Committee. The Technical Evaluation Committee, comprised of 18 members from various States, would determine whether the proposals satisfied the technical performance criteria of the RFP by reviewing each of the proposals against certain weighted criteria. The Financial Evaluation Committee would review and evaluate the cost estimates submitted by the bidders. A third committee, the Selection Committee, was designated to review the evaluation reports submitted by the Financial and Technical Evaluation Committees and to make final offers.

The deadline for notices of intention to bid was July 2, 1995. While over 20 entities indicated an intention to bid, only five— First Security Processing Services, Fleet Financial Group, Inc., Chemical Banking Corporation, Citicorp Services and Elec-

---

1. The States are New York, Connecticut, Maine, New Hampshire, Vermont, Massachusetts and Rhode Island.

tronic Data Systems—actually submitted bids by the September 14 deadline. On November 7, 1995 a Best and Final Offer (BAFO) letter was mailed to the five bidders requiring them to submit a BAFO by November 22, 1995. On December 15, 1995, after receipt of the initial BAFO responses from the five bidders, clarification letters were sent with responses due on January 8, 1996. On February 6, 1996 the Coalition notified Citicorp of its acceptance and included a list of contingencies that had to be resolved prior to a final contract. On April 15, 1996, DSS and Citicorp entered into a seven-year contract for provision of an EBTS throughout New York State.

The contract was submitted for approval to the Comptroller, as required by State Finance Law § 112 (2) (a). The State Comptroller's Office approved the contract[2] over the opposition of Check Cashers and Transactive, which filed protests. In a detailed and extensive "Determination of Bid Protest," the Office concluded that the procurement was conducted in a manner consistent with the State competitive bidding requirements.

In October 1995, Check Cashers and Rivera commenced a CPLR article 78 proceeding against DSS challenging the validity of the RFP and the contract awarded thereunder. Citicorp joined as intervenor/respondent. In May 1996, Check Cashers commenced a declaratory judgment action against DSS and Citicorp seeking similar relief. Two months later, Transactive, a subcontractor of Fleet Financial Group, Inc., also commenced a similar article 78 proceeding against DSS, and again Citicorp joined as a respondent.

Supreme Court converted Check Cashers declaratory judgment action into an article 78 proceeding and granted the petitions. It also held that Transactive had standing and that DSS had violated provisions of the State Finance Law, thereby rendering the award to Citicorp null and void.

The Appellate Division reversed and dismissed the petitions, concluding that only Transactive had standing. As to the merits of the claim, the Court held that DSS had not violated any State Finance Law requirements, that "no favoritism, fraud or corruption [was] presented here and that there [was] no material or substantial irregularity in the bidding process which undermined the fairness of the competition" (236 AD2d 48, 54), and that the award had a rational basis. We granted leave to appeal, and affirm solely on petitioners' lack of standing.

---

**2.** Because he had previously been employed by Citicorp, the Comptroller, H. Carl McCall, disqualified himself from the determination.

## 1. Standing Under *Society of Plastics*

For standing to sue, petitioners must show that they have suffered an injury in fact, distinct from that of the general public (*Society of Plastics Indus. v County of Suffolk*, 77 NY2d 761, 771-774). This is so since, under common law, a court is without power to right a wrong where civil, property or personal rights are not affected (*id.,* at 772; *Schieffelin v Komfort*, 212 NY 520, 530). Moreover, petitioners must demonstrate that the injury claimed falls within the zone of interests to be protected by the statute challenged (*Society of Plastics Indus. v County of Suffolk, supra,* at 774). This prerequisite ensures that a group or an individual "whose interests are only marginally related to, or even inconsistent with, the purposes of the statute cannot use the courts to further their own purposes at the expense of the statutory purposes" (*id.,* at 774).

Because Check Cashers had no direct stake in the outcome of the bidding process, it did not suffer an injury in fact. Although it stood to lose remuneration for services performed under the pre-EBTS arrangement, that would be the case no matter who was awarded the contract. The injury suffered by Check Cashers, then, arose from the decision to have the EBTS, not from the procurement process to determine who would implement it.

Additionally, Check Cashers' alleged injury is not within the zone of interests protected by State Finance Law § 163. One of the purposes of article 11 of the State Finance Law is to protect those who bid on service contracts by insuring that the decisionmaking procedures are equitable. The procurement process of the State exists to "promote purchasing from responsive and responsible offerers * * * based on clearly articulated procedures" (State Finance Law § 163 [2] [a], [b]). Check Cashers, however, was not an offerer within the meaning of article 11 and acknowledged that it did not have the capacity to be a bidder and prime responsible contractor for this project.

Transactive, by contrast, may be viewed as having suffered a potential economic injury, distinct from the public at large. As the lead subcontractor for Fleet, and as a member of the Fleet "team" assembled to implement the contract, if awarded to Fleet, Transactive lost the opportunity to perform work on the EBTS contract, and to benefit financially. Transactive, however, is not within the zone of interests protected by State Finance Law § 163 because it was not a bidder or offerer under State Finance Law article 11. Allowing any entity to

bring suit based upon its status as a "bidding team member" would confer standing for far too many potential litigants and allow those "whose interests are only marginally related" (*Society of Plastics Indus. v County of Suffolk, supra*, at 774) under State Finance Law § 163 concerns to assert collateral challenges. That repercussion would not only create uncertainty in the minds of bidders, but also would be inconsistent with "the policy of protecting the welfare of the community by limiting judicial review of remedial legislation when such challenges are made by pressure groups seeking to delay or defeat action in order to further their own economic interests" (*id.,* at 779).

Transactive's reliance upon *Matter of Automated Wagering Intl. v New York State Dept. of Taxation & Fin.* (195 AD2d 169, *lv denied* 84 NY2d 803), recognizing the standing of a wholly owned subsidiary of an actual bidder to whom the contract was to be formally assigned, is misplaced. Even if we agreed with that standard—a question we do not reach—Transactive is not alleged to be a wholly owned subsidiary of Fleet. Nor is petitioners' reliance on *Matter of Kick v Regan* (110 AD2d 934, *lv denied* 66 NY2d 601) and *Elia Bldg. Co. v New York State Urban Dev. Corp.* (54 AD2d 337) persuasive. The courts permitted plaintiffs to continue actions in those cases, even though they were not offerers, because the State was found to have violated the competitive bidding statutes in preventing the aggrieved parties from submitting an actual bid. Petitioners do not persuasively fit within the ambit of that circumstance, in any event.

## 2. State Finance Law § 123-b Taxpayer Standing

Petitioners Check Cashers and Rivera alternatively contend that they have standing to sue as taxpayers under State Finance Law § 123-b.[3]

The Legislature in State Finance Law § 123 grants individual taxpayers "an interest in the proper disposition of all state

---

**3.** The statute provides that "any person, who is a citizen taxpayer, whether or not such person is or may be affected or specially aggrieved by the activity herein referred to, may maintain an action for equitable or declaratory relief, or both, against an officer or employee of the state who * * * is now causing, or is about to cause a wrongful expenditure, misappropriation, misapplication, or any other illegal or unconstitutional disbursement of state funds or state property, except that the provisions of this subdivision shall not apply to the authorization, sale, execution or delivery of a bond issue or notes issued in anticipation thereof by the state" (State Finance Law § 123-b [1]).

funds and properties". The statutory authorization, however, is not extended to a taxpayer who essentially seeks "to obtain judicial scrutiny of the [State's] nonfiscal activities" (*Matter of Urban League v County of Monroe*, 49 NY2d 551, 556). Claims which seek review of a State actor's alleged mismanagement of funds or the arbitrary and capricious distribution of funds lawfully allocated to an agency are not covered by section 123-b (*see, e.g., Leichter v Barber*, 88 AD2d 1029).

■ Appellants' claims are not of the kind for which State Finance Law § 123-b confers standing. They do not argue that DSS acted outside its authority in issuing an RFP seeking bidders for an EBTS but, rather, take issue with the procurement procedures followed. As described even by appellants, the essence of the jointly decided lawsuit "concerns how the procurement was conducted."

We note that our conclusion is also supported by sound public policy. A rule of law which extended standing to all and any taxpayers to contest the manner in which State agencies award contracts might seriously disrupt State operations. As this Court has previously cautioned, "it is one thing to have standing to correct clear illegality of official action and quite another to have standing in order to interpose litigating plaintiffs and the courts into the management and operation of public enterprises" (*Matter of Abrams v New York City Tr. Auth.*, 39 NY2d 990, 992).

### 3. Common-Law Taxpayer Standing

■ In *Boryszewski v Brydges* (37 NY2d 361), this Court held that a taxpayer would have the legal standing to challenge governmental action if "the failure to accord such standing would be in effect to erect an impenetrable barrier to any judicial scrutiny of legislative action" (*id.*, at 364). This rule is not implicated in the instant action. First, petitioners do not seek review of any legislative action. Second, no "impenetrable barrier" exists. Any of the bidders whose proposals were rejected by DSS could have brought suit to challenge the contract award made to Citicorp (*see, Weimer v Board of Educ.*, 52 NY2d 148, 155; *Matter of Altamore v Barrios-Paoli*, 90 NY2d 378, 384 [same]).

For the reasons stated, Rivera has no standing either pursuant to State Finance Law § 123-b or under the common law because of her status as a taxpayer and a government benefits recipient.

Because petitioners lack standing to sue, we reach no other substantive issues.

Accordingly, in each appeal, the order of the Appellate Division should be affirmed, with costs.

Chief Judge KAYE and Judges BELLACOSA, LEVINE, CIPARICK and WESLEY concur.

In each case: Order affirmed, with costs.