[824 NYS2d 59]

HUNTS POINT TERMINAL PRODUCE COOPERATIVE ASSOCIATION, INC., Respondent, v NEW YORK CITY ECONOMIC DEVELOPMENT CORPORATION et al., Appellants.

First Department, November 9, 2006

APPEARANCES OF COUNSEL

*Michael A. Cardozo, Corporation Counsel*, New York City (*Terri Feinstein Sasanow, Lawrence S. Kahn, Nancy F. Brodie, Michael S. Adler, Drake A. Colley* and *Leonard Koerner* of counsel), for municipal appellants.

*Leahey & Johnson, P.C.*, New York City (*Peter James Johnson, Jr., James P. Tenney* and *Joanne Filiberti* of counsel), and *Phillips Nizer LLP*, New York City (*Helen Davis Chaitman* and *Elizabeth Adinolfi* of counsel), for Baldor Specialty Foods, Inc., appellant.

*Gibson, Dunn & Crutcher LLP*, New York City (*Randy M. Mastro, Cynthia S. Arato, Georgia K. Winston* and *Aaron Goodman* of counsel), for respondent.

## OPINION OF THE COURT

Catterson, J.

The Hunts Point Food Distribution Center was created in 1967 and occupies almost half of the 690-acre Hunts Point peninsula.[1] Located within the Food Distribution Center are several public markets including the New York City Terminal Market (hereinafter referred to as the Produce Market), the Hunts Point Cooperative Market, which is a meat market (founded in 1974), and the Fulton Fish Market at Hunts Point. In 2005, there were a number of food distribution companies within the Food Distribution Center, including, inter alia, Dairy-

---

1. Hunts Point is named for Thomas Hunt, Jr., the son-in-law of Edward Jessup who, with John Richardson, purchased the land from the indigenous people, the Wekkguasegeeck tribe, in 1663.

land, USA Corp. (hereinafter referred to as Dairyland) and the Great Atlantic & Pacific Tea Co. (hereinafter referred to as A & P).

The Produce Market consists of 126 acres and contains 275 store units in 10 buildings. In 1986, the City of New York (hereinafter referred to as the City) executed a 25-year lease with petitioner Hunts Point Terminal Produce Cooperative Association, Inc. (hereinafter referred to as the Cooperative) and transferred the operation and maintenance of the Produce Market to the Cooperative, which presently consists of 51 family-owned wholesale produce businesses.

Against this backdrop, The Bronx Terminal Market (hereinafter referred to as BTM), which is located in the West Haven section of the Bronx near Yankee Stadium, had deteriorated over the years. By 2004, the City had spent more than a decade in litigation with the ground lessee and had repeatedly sought to terminate the lease in an effort to redevelop the property. (*See Siegmund Strauss, Inc. v Strategic Dev. Concepts, Inc.*, 10 Misc 3d 1067[A], 2006 NY Slip Op 50008[U] [Sup Ct, NY County 2006].) The litigation was ultimately settled and agreements were entered into to develop a retail complex on the site. However, this planned redevelopment required the termination of public market operations and displacement of the 22 produce wholesalers who operated within the BTM. As a result, the City sought solutions on where to relocate these displaced wholesalers.

In 2004, respondent New York City Economic Development Corporation (hereinafter referred to as EDC), a not-for-profit local development corporation that performs certain services for the City, including lease administration of city-owned market property, published a request for proposals (hereinafter referred to as the RFP) seeking proposals to lease a 10.5-acre vacant parcel of land within the Food Distribution Center along Food Center Drive (hereinafter referred to as Site C). It is undisputed that EDC is not a city agency. EDC received qualified responses from Anheuser Busch, Dairyland and respondent Baldor Specialty Foods, Inc. (hereinafter referred to as Baldor), a non-unionized supplier of produce to luxury food operators such as restaurants and hotels. At the time, Baldor's business was located at 511 Barry Street, which is in Hunts Point, but not in the public market area.

Selection of the Site C tenant was subsequently delayed because in the summer of 2005, A & P, which leased the premises

located at 155 Food Center Drive (hereinafter referred to as the Premises) which is the center of the instant controversy, decided to move its operations and sought to divest itself of the Premises through a sublease. The Premises is across the street from the Produce Market and consists of two parcels. One parcel is nine acres and contains a 185,000-square-foot refrigerated warehouse and distribution facility. The other parcel is almost seven acres and contains an 8,000-square-foot garage and parking facility.

The Cooperative, Baldor and Dairyland all expressed interest in the Premises. However, when A & P was on the verge of entering into a sublease with Dairyland for the Premises, EDC reminded A & P that pursuant to its lease with the City, A & P was not permitted to profit from any sublease arrangements. In September 2005, following further discussions with EDC, A & P broke off negotiations with Dairyland and ultimately surrendered the Premises to the City.

Dairyland then communicated to EDC that it needed to expand immediately and that unless a decision on the Premises was made by September 30, 2005, it would move its business and take 800 jobs with it to New Jersey. EDC resisted requests to do a sole source transaction with Dairyland and instead, issued a Long Term Lease Opportunity (RFP) for the Premises.

EDC solicited offers through a direct mailing to companies that had previously expressed interest in the Premises, including, inter alia, the Cooperative, Baldor and Dairyland. EDC also published the RFP in several newspapers. The RFP was made public on September 19, 2005 and responses were due by September 26th.[2] Because of the obvious time constraints, the submission requirements were simplified by EDC. Moreover, EDC's standard Industrial Development Questionnaire was modified to include a question asking for a description of the responding company's proposed use for its existing facility "ie. keep for existing operations, sublease, etc." This question was added for the specific purpose of facilitating EDC's objective of relocating the displaced BTM wholesalers.

In addition to describing the Premises, the RFP defined EDC's redevelopment goals as follows:

"As part of a designated New York City public mar-

---

2. At the same time it issued the RFP for the Premises, EDC sent final and best offer letters to Baldor, Dairyland and Anheuser Busch in connection with Site C. Only Anheuser Busch responded and on December 1, 2005, it was designated as the Site C tenant/developer.

ket area, the [Premises] is intended to be used for the wholesale purchase, sale, or storage of food, flowers,

or ornamental plants. [EDC] is seeking uses for [the Premises] that are consistent with and complementary to the surrounding market uses, and that would contribute to the overall economy of this area of the Bronx. Proposals should be limited to food-related uses including warehousing, processing, handling, storage, and wholesale distribution of food, flowers, or ornamental plants.

"[EDC] anticipates leasing the [Premises], either in whole, or in two individual parcels, to one or more Industrial firms, engaged in the production, processing or distribution of food products. [EDC] will consider offers with an initial lease term of 20 years and an option for two (2) ten-year lease renewals. Lease offers that maximize the full development potential of all or a portion of the [Premises] are strongly encouraged. Joint lease/tenancy offers from more than one company will be accepted. Proposals should include the rent offer, a rent escalation schedule, and an offer for all fixtures remaining within the building."

Furthermore, EDC stated that it would use the following evaluation criteria for reviewing the submissions:

"Economic Impact on/Spending in New York City— projected expenditures, including annual ground lease payments and annual operating costs; permanent on-site employment and payroll; and any applicable New York City taxes such as real property, sales, and personal income taxes;

"Job Creation and Retention—number of existing permanent jobs and number of projected new permanent jobs;

"Site Utilization—current utilization plans for the [Premises]; and the extent to which future expansion plans maximize the development potential of the [Premises] in a manner consistent with applicable zoning, environmental and other regulatory controls."

Six entities submitted proposals to EDC by the deadline, including the Cooperative, Baldor and Dairyland and a group of

three displaced BTM wholesalers. Baldor included in its proposal an offer to pay $9.50 per square foot for the first parcel and $3 per square foot for parcel two. Baldor also stated that it would be willing to take parcel one only and that it would invest $5 million to $7 million in the property. Moreover, Baldor submitted that it would retain the 510 employees it currently had and would add another 450 employees within three years. Finally, Baldor gave its assurance that it would sell or lease its existing facility to displaced BTM wholesalers.

The Cooperative's proposal was significantly different. It included not only an offer to lease the Premises, but to combine the Premises with the existing Produce Market. Pursuant to the Cooperative's plan, Food Center Drive would have to be almost entirely reconfigured and certain utilities would have to be relocated.[3] The cost of the Cooperative's anticipated expansion of the Produce Market was $400 million, which the Cooperative proposed should be financed by the city, state and federal governments. In addition, the Cooperative offered to pay an annual rent of $1.2 million with a 3% per year escalation for the Premises during the proposed four-year construction and $9.25 million annually thereafter. Moreover, the Cooperative submitted that presently it had about 4,700 employees and would add another 2,000.[4] Regarding its current facility, the Cooperative stated that it would "keep [it] for extant operations and develop new buildings on site."

EDC, in an internal memorandum dated September 27, 2005, determined that "Baldor put forward the most competitive lease offer package" and cited the strengths of Baldor's offer as follows:

> "A bid of $9.50/SF for the building and $3/SF for the expansion parcel escalating at 10% every ten years, resulting in an initial yearly rent of $1.76MM/ year (building only), with an NPV of $19.2M over 20 years.

> "Retention of Baldor's existing 510 jobs, with an anticipated addition of 450 newly created jobs over 3 years.

---

**3.** The Cooperative had previously submitted a similar plan to redevelop the Produce Market in January 2005 in response to the Hunts Point Vision Plan that was proposed by a task force formed by Mayor Bloomberg.

**4.** However the Cooperative's responses to the Industrial Development Questionnaire submitted with its proposal indicate the creation of only 19 jobs rather than 2,000.

"Investment of $5-$7MM in improvements to the facility, including repairs and upgrades.

"The lack of need for the entire 15.8 acre site. As the [site] is approximately 2.5 times the size of Baldor's current facility (cubic space). Baldor does not have a demonstrated need for significant additional development on the expanded parcel. . . .

"Utilization of rail freight to reduce truck traffic and emissions.

"Willingness to sell or lease the company's existing facility in Hunts Point to Bronx Terminal Market tenants.

"Baldor's current facility consists of an approximately 140,000 SF warehouse and distribution building with parking for 70 cars and up to 150 trucks, and 37 loading docks.

"The company has recently invested $3M into a new computerized, energy efficient refrigeration system for the building.

"The company would be willing to lease the space for around $8-$8.50/SF, or [ ] sell the building. Please note that Baldor purchased the building in 1999 for $4.7MM.

"Given that the three Bronx Terminal Market tenants submitting an offer for the . . . [Premises] currently occupy approximately 137,000 SF, Baldor's existing facility may be able to accommodate their exiting needs, and the relocation assistance offered to the BTM tenants could be put towards fit-out of the space. Baldor's recent investment in refrigeration allows these companies to allocate relocation funds (estimated at $1.37MM) toward other possible improvements needed at the location (e.g. space division)."

EDC also noted that Baldor's proposal had a net present value of more than $29 million while the net present value of the Cooperative's proposal was negative $69,283,347 in light of the public assistance the Cooperative would be seeking for the costs of the comprehensive construction project.

Moreover, it is clear that the relocation of displaced tenants was not the single most important factor driving EDC. Sailaja

Kurella, a project manager in EDC's Real Estate Development Department, testified at the hearing that the most important of EDC's reasons for choosing Baldor were (i) the amount of money offered for rent and investment in infrastructure improvements; (ii) the number of jobs to be retained and created; and (iii) the lack of demonstrated need for the entire site, thus affording EDC the opportunity to solicit additional development proposals for the remaining portion in order to accommodate others who needed space in the Hunts Point area. In Kurella's view, although Baldor's willingness to sell or lease its existing facility to the BTM tenants was worthy of mention, it was not a "key component" of the offer (relocation offer not listed as one of the "strengths" of Baldor's proposal). Rather, the relocation feature was just "icing on the cake."

The testimony of Brian Murphy, EDC's Executive Vice-President, was entirely consistent with that of his subordinates, and with the plain language of the RFP. The redevelopment goals in the RFP explicitly stated that EDC was "seeking uses for this Site that . . . would contribute to the overall economy of this area of the Bronx."

On October 12, 2005, EDC's representatives, including Murphy, met with representatives from Baldor to discuss Baldor's proposal. At the meeting, EDC presented Baldor with a letter asking it to confirm the terms of its proposal and asked Baldor what rent it would charge for its current facility on Barry Street. The sum of $8 per square foot was proposed by EDC and agreed upon by Baldor.[5] It is undisputed that the displaced BTM wholesalers ultimately rejected Baldor's Barry Street facility.

On November 14, 2005, EDC issued a conditional designation letter to Baldor setting forth the terms and conditions under which EDC would negotiate a lease for the Premises, and Baldor accepted. On December 1, 2005, Mayor Bloomberg announced the designation of Baldor at a press conference.

In January 2006, the Cooperative commenced the instant CPLR article 78 proceeding challenging the award of the Premises to Baldor. In its amended verified petition, the Cooperative set forth seven causes of action, including, inter alia, that (1) the acts of EDC and the City "in awarding the [Premises] to Baldor were unlawful, irrational, arbitrary and

5. The undisputed testimony of record establishes that Baldor was originally "shocked" and "surprised" at the $8 per square foot price because it was too low.

capricious, an abuse of discretion and contrary to law because EDC conducted a sham, bad faith bidding process."

The Cooperative maintained that the RFP process pursuant to which Baldor was designated as the lessee of the Premises was unfair. The Cooperative urged that the "extremely short," seven-day window in which to respond to the RFP showed that the decision to designate Baldor as the lessee of the Premises was predetermined. The Cooperative pointed out that EDC usually provided 60 days to provide responses to RFPs and argued that the sole reason to designate Baldor as the lessee was because Baldor, in an undisclosed arrangement, assured EDC that its existing facility could be leased to the displaced BTM wholesalers.

According to the Cooperative, this factor was never disclosed to it or the other entities responding to the RFP. The Cooperative contended that the displacement of the BTM wholesalers was widely criticized and a political liability in an election year. Thus, in the Cooperative's view, EDC and the City attempted to quell the controversy by entering into this side agreement with Baldor. Moreover, the Cooperative alleged that the actions of EDC, the City and Baldor following the deadline for responses to the RFP showed that the outcome was predetermined. Furthermore, the Cooperative insisted that its proposal was more beneficial to the City and the Produce Market.

Following the parties' submissions, the court held a 13-day nonjury trial on the first cause of action. Initially, the court determined that the Cooperative had standing inasmuch as it was an unsuccessful bidder. The court then annulled the conditional designation of Baldor as the lessee of the Premises on the grounds that EDC's decision-making process was arbitrary and unfair.[6] It determined that EDC's RFP did not openly disclose the objective of providing potential relocation space to the displaced BTM wholesalers. The court pointed to question 40 in attachment D to the RFP, which asked for the applicant's "Proposed use for company's existing facility (ie. keep for existing operations, sublease, etc.)", and noted that this "buried inquiry" was used as the critical evaluation criterion. (13 Misc 3d 988, 994.) The court found the testimony of Brian Murphy (EDC's Executive Vice-President), that the relocation of the displaced BTM wholesalers was not an objec-

---

**6.** During the course of the trial, the court issued a TRO enjoining the respondents from entering into a lease for the Premises.

tive, to be incredible. The court further found that had EDC disclosed the importance of relocating the BTM wholesalers to EDC's goals for and evaluation of lease offers, the Cooperative and others could have incorporated means to provide that relocation space in their lease offers.

The court also cited what it considered to be evidence of collusion between EDC and Baldor. Initially, the court noted that although, in its September 27, 2005 memorandum outlining the strengths of Baldor's proposal, EDC said that Baldor was willing to lease its current facility to BTM wholesalers for $8 to $8.50 per square foot, Baldor's proposal mentioned no such figure. According to the court, "[t]he only plausible explanation is that EDC or other City officials or employees had communicated with Baldor before submission of the proposals due September 26, 2005, concerning Baldor's willingness to make its current facility available for the BTM tenants' relocation." (*Id.* at 1000.)

The court also referred to the cover letter accompanying Baldor's proposal in which its CEO stated "*[b]ased on preliminary conversations*, we believe our building is capable of meeting the requirements of some of the major vendors of the [BTM] who would be affected by the expansion of Yankee Stadium. We would *pursue those discussions* in conjunction with our relocation to the [Premises]." (*Id.* at 1001.) The court determined:

> "through conversations or discussions between EDC or City representatives and Baldor representatives, Baldor gained an understanding as to the significance of the BTM tenants' relocation for the City and EDC, not just as a public issue, but specifically its central significance in the context of [the Premises'] disposition. This mutual understanding emerged before EDC issued the [RFP] and was undisclosed to other applicants for that site, including [the Cooperative]." (*Id.*)

Furthermore, the court found that the "unprecedented short response time" discouraged a competitive proposal from the Cooperative and other applicants. (*Id.* at 999.) The court held that while EDC was permitted to complete the process "quickly and to target [ ] a particular category of potential tenants, the process unquestionably was not the model of transparency and evenhandedness befitting a public agency." (*Id.* at 1003.)

Finally, in addition to annulling the designation of Baldor as lessee, the court enjoined EDC and the City from entering into

a lease for the Premises until "EDC or the City has undertaken and implemented a new procedure for [the] [P]remises' disposition and the selection of a lessee . . . or purchaser, consistent with this decision." (*Id.* at 1009.) The court stated that any future offering of the Premises must not exclude the Cooperative or Baldor and that

> "[i]f EDC and the City are to realize the maximum public benefit from the [P]remises' disposition, as is EDC's mandate, EDC must allow applicants for these [P]remises a reasonable period to submit proposals that will set forth the best ways to meet that goal, consistent with any need for a speedy process to realize maximum public benefit." (*Id.*)

For the reasons that follow, we reverse the judgment of Supreme Court, reinstate the determination of EDC, and vacate the injunction. The standard of review in this article 78 proceeding is whether the City's decision to accept EDC's recommendation of Baldor as the successful responder to the RFP was arbitrary and capricious, lacked a rational basis, or was otherwise dishonest or unlawful.[7] (CPLR 7803 [3]; *see also Matter of Pell v Board of Educ. of Union Free School Dist. No. 1 of Towns of Scarsdale & Mamaroneck, Westchester County*, 34 NY2d 222, 231 [1974].)

We are empowered to examine the record de novo and may reject credibility determinations where they lack a sound and substantial basis in the record. Our authority "is as broad as that of the trial court." (*Northern Westchester Professional Park Assoc. v Town of Bedford*, 60 NY2d 492, 499 [1983].)

We find that this proceeding is resolved solely on the question of standing. Baldor asserts that the Cooperative's petition should have been denied because it lacked standing to challenge EDC's designation of Baldor as lessee of the Premises. The

---

7. Unaddressed in the parties' briefs or the decision below is the question of whether an article 78 proceeding may be properly brought against EDC. The one reported case involving EDC and article 78 does not address the issue but rather concerns petitioner's standing to commence the proceeding. (*Creole Enters. v Giuliani*, 167 Misc 2d 81 [Sup Ct, NY County 1995], *affd* 236 AD2d 272 [1997].) The record in the instant case is insufficiently developed to determine if EDC may be considered an "agency" for purposes of article 78. (*See e.g. Matter of Farms First v Saratoga Economic Dev. Corp.*, 222 AD2d 861 [3d Dept 1995]; *Matter of Buffalo News v Buffalo Enter. Dev. Corp.*, 173 AD2d 43 [4th Dept 1991], *appeal dismissed* 79 NY2d 977 [1992].) In this case, the result would be the same even were we to determine that EDC was not subject to article 78.

court resolved the standing question by holding that the Cooperative had "a direct stake in the outcome of the lease opportunity process." (13 Misc 3d at 1007.) Furthermore, the court found that, "[w]hen the outcome was an award to another applicant, petitioner lost the opportunity for the lease and its economic benefits." (*Id.*)

The lower court's pronouncements fall short of the analysis required to establish standing pursuant to article 78. The Cooperative bears the burden of showing that it has "suffered an injury in fact, distinct from that of the general public." (*Matter of Transactive Corp. v New York State Dept. of Social Servs.*, 92 NY2d 579, 587 [1998], citing *Society of Plastics Indus. v County of Suffolk*, 77 NY2d 761, 771-774 [1991]; *Lujan v National Wildlife Federation*, 497 US 871 [1990].) Furthermore, the Cooperative "must demonstrate that the injury claimed falls within the zone of interests to be protected by the statute challenged." (92 NY2d at 587.)

Turning to the latter first, it is undisputed that EDC is not a governmental agency but rather a not-for-profit development corporation formed pursuant to Not-For-Profit Corporation Law § 1411. EDC is a party to two annually-renewed contracts with the City. The Maritime Contract in effect at the time of the underlying lease opportunity, ran from July 1, 2005 through June 30, 2006. Under that contract, the City retained EDC to perform the "Program" subject to "the direction and control" of the City's Deputy Mayor for Economic Development and Rebuilding in cooperation with the Department of Small Business Services. The Program services included the management and development of the City's wholesale food markets; leasing city-owned property; and recommending the terms of leases to the Deputy Mayor. Section 2.01 (i) focused upon "negotiating real property disposition agreements" including agreements for the "City's wholesale and retail food markets."

It is also undisputed that the RFP was issued by EDC in the form of a "Long Term Lease Opportunity" pursuant to EDC's contract with the City. Furthermore, New York City Charter § 1301 (2) (a) makes no provision for public process for the lease of public market space. Nor are there other statutes circumscribing EDC's authority in issuing an RFP or what the content of such an RFP should be. It is also undisputed that the City's public market property is not subject to municipal public bidding requirements. Indeed, disposition of the property at issue is exempted from the operation of NY City Charter § 384 (b)

since NY City Charter § 1301 (2) and (2) (a) "expressly vest the authority to lease public markets exclusively in the Commissioner of the Department of Small Business Services." (*Siegmund Strauss, Inc. v Strategic Dev. Concepts, Inc.*, 10 Misc 3d 1067[A], 2006 NY Slip Op 50008[U], *8; *see also New Colonial Ice Co., Inc. v Woolley*, 181 Misc 473 [Sup Ct, NY County 1943].) Thus, neither EDC nor the City were required by law to conduct *any* competitive bidding process for Hunts Point. The Cooperative fails to allege any violation of NY City Charter § 1301 or, indeed, any other statute. Standing for the Cooperative premised on an alleged absence of competitive bidding does not bring the Cooperative within a relevant "zone of interest" for standing because the process at issue is wholly exempt from competitive bidding by law.

Our holding in *Matter of Madison Sq. Garden, L.P. v New York Metro. Transp. Auth.* (19 AD3d 284, 286 [1st Dept 2005], *appeal dismissed* 5 NY3d 878 [2005]), that the New York Metropolitan Transportation Authority (hereinafter referred to as MTA), as a governmental entity, "must treat bidders fairly," is inapposite. *Madison Square Garden* is the most recent ratification of a series of cases wherein we have held that the MTA, even though it is a public body, is not required to submit all contracts to public bidding. However, when the MTA does "solicit bids, it is required to act fairly toward all bidders." (*Matter of Tri-State Aggregates Corp. v Metropolitan Transp. Auth.*, 108 AD2d 645, 646 [1st Dept 1985]; *see Square Parking Sys. v Metropolitan Transp. Auth.*, 92 AD2d 782, 784-785 [1st Dept 1983], *lv dismissed* 59 NY2d 608 [1983].) The application of this fairness obligation to EDC is, however, dubious at best since contrary to the hearing court's observation that EDC is a "public agency," EDC is a not-for-profit corporation under contract to the City, not a public authority such as the MTA. (13 Misc 3d at 1007.)

Even were we to extend the fairness doctrine of the MTA cases to the instant dispute under a zone of interest inquiry, standing would not be established. "A request for proposals (RFP) need not spell out every single factor." (*Madison Sq. Garden*, 19 AD3d at 286, citing *Matter of Transactive Corp. v New York State Dept. of Social Servs.*, 236 AD2d 48, 53 [3d Dept 1997], *affd* 92 NY2d 579 [1998].) The RFP process was utilized by EDC because it "is a more flexible alternative to competitive bidding." (*Madison Sq. Garden, supra* at 286; *see e.g. Jo & Wo Realty Corp. v City of New York*, 157 AD2d 205, 212-214 [1st

Dept 1990], *affd* 76 NY2d 962 [1990]; *and see Matter of Citiwide News v New York City Tr. Auth.*, 62 NY2d 464 [1984].) EDC was not even required to utilize an RFP in order to lease the property at Hunts Point market. We find nothing in the RFP process in this case that was either hidden or biased in favor of Baldor.

Not only has the Cooperative failed to allege that there is a relevant zone of statutory interest at issue, it has not sufficiently alleged injury-in-fact. Mere competitive injury does not suffice as injury-in-fact. "[A] competitive injury, in and of itself, does not confer standing to challenge an administrative determination." (*Matter of Subway Check Cashing Serv. v Considine*, 158 AD2d 406, 406 [1st Dept 1990], citing *Matter of Dairylea Coop. v Walkley*, 38 NY2d 6 [1975].) Merely because Baldor, an erstwhile competitor of the Cooperative, won the RFP, it does not follow that the Cooperative suffered injury cognizable for standing purposes.

The only remaining part of the test for standing yet unresolved is whether the Cooperative has established actual injury. That inquiry necessarily turns on whether the Cooperative could have prevailed as the successful responder to the RFP, had the EDC not selected Baldor. This presents several problems for the Cooperative not addressed by the hearing court.

The Cooperative proposed not merely leasing the site in question consistent with the terms of the RFP but rather, "relocation and reconfiguration of Food Center Drive to the easement behind the 155 property." In reality, this was a part of what the Cooperative described as its "market development plan." The "relocation and reconfiguration" was not without considerable cost. The Cooperative proposed that it would expend $400 million in as yet unrealized city, state and federal monies. The Cooperative advised EDC that the "funding of the property lease and development costs cannot be cleanly broken away from the larger issue of funding the Market Development Program." Without question, this varied the terms of the RFP by interjecting factors not solicited by EDC, not contemplated by the RFP, and most certainly not within the control of the Cooperative. For these reasons alone, the Cooperative could not have succeeded with its lease proposal. (*See e.g. S.S.I. Invs. v Korea Tungsten Min. Co.*, 80 AD2d 155, 162 [1st Dept 1981], *affd* 55 NY2d 934 [1982] ["(t)he viability of the bid . . . depended upon circumstances wholly independent from the actions of the offerer"].) By varying the terms of the RFP with its submission, the Cooperative interjected factors simply "not capable of determination in any precise manner." (*Id.*)

Furthermore, the Cooperative's proposal contained a series of conditions precedent to its performance. The proposal required the total reconfiguration of Food Center Drive, the finances needed to pay for that construction, and the governmental permits and approvals attendant to such a complex project. An RFP response contingent on such conditions precedent to the Cooperative's performance was properly rejected by EDC.

Finally, even if we were to conclude that the Cooperative had the necessary standing to challenge the EDC's designation, the result would nonetheless be the same. The above analysis of the merits and liabilities of the respective proposals demonstrates that the EDC did not act in an arbitrary and capricious manner in selecting Baldor; that there was ample evidence from which the EDC could conclude that Baldor submitted the superior proposal; and that the Cooperative's proposal fell far short in comparison.

Accordingly, the order and judgment (one paper) of the Supreme Court, Bronx County (Lucy Billings, J.), entered June 6, 2006, which, after a nonjury trial, granted the relief sought by petitioner on its first cause of action and annulled the conditional designation of respondent Baldor Specialty Foods, Inc. as lessee of 155 Food Center Drive, Hunts Point, and enjoined the municipal respondents from entering into a lease for the premises until respondent New York City Economic Development Corporation and respondent City of New York have undertaken and implemented new procedures for the disposition of the Premises should be reversed, on the law, without costs, the determination of EDC reinstated and the injunction vacated.

SAXE, J.P., FRIEDMAN, WILLIAMS and MALONE, JJ., concur.

Order and judgment (one paper), Supreme Court, Bronx County, entered June 6, 2006, reversed, on the law, without costs, the determination of New York City Economic Development Corporation reinstated and the injuction vacated.