[926 NYS2d 671]

In the Matter of FEMINISTS CHOOSING LIFE OF NEW YORK, INC., et al., Appellants, v EMPIRE STATE STEM CELL BOARD et al., Respondents.

Third Department, June 16, 2011

48

## APPEARANCES OF COUNSEL

*Thomas Marcelle*, Albany (*Kathleen M. Scanlon*, New York City, of counsel), for appellants.

*Eric T. Schneiderman, Attorney General*, Albany (*Andrew B. Ayers* of counsel), for respondents.

*Kelley Drye & Warren, L.L.P.*, New York City (*Neil Merkl* of counsel), for Kevin T. Fitzgerald, S.J., Ph.D. and others, amici curiae.

*Edward T. Mechmann*, New York City, for New York State Catholic Conference, amicus curiae.

*Philip J. Vecchio*, East Greenbush, for Theresa Deisher, Ph.D., amicus curiae.

## OPINION OF THE COURT

GARRY, J.

In 2007, the Legislature created respondent Empire State Stem Cell Board (hereinafter ESSCB) to administer the Empire State Stem Cell Trust Fund (hereinafter Fund) by making grants to researchers working to advance the field of stem cell biology (*see* Public Health Law § 265-a [1]; State Finance Law § 99-p; L 2007, ch 58, part H [hereinafter the Stem Cell Act]). ESSCB consists of a funding committee responsible for, among other things, soliciting and approving grant applications, and an ethics committee responsible for, among other things, recommending and ensuring compliance with appropriate ethical, scientific and medical standards (*see* Public Health Law §§ 265-b, 265-c). In 2009, upon the recommendation of the ethics committee, the funding committee adopted a resolution to include in future grant contracts a clause permitting contractors to reimburse women for donating oocytes, or eggs, for research purposes.[1] Petitioner Feminists Choosing Life of New York, Inc., along with individual members of its board of directors, brought this combined action, as amended, for declaratory judgment and proceeding pursuant to CPLR article 78 against ESSCB and respondent Commissioner of Health seeking, among other things, to annul the resolution. Respondents answered and sought to have the petition dismissed. After oral argument, Supreme Court dismissed the petition, in part on grounds of standing and in part on the merits. Petitioners appeal.

---

1. The resolution permits reimbursement for such expenditures as travel, housing, and medical care, as well as for the time, inconvenience, and burden of donation, without regard to the number or quality of oocytes that may result.

█ Initially, we agree with Supreme Court that the individual petitioners lack standing as citizen taxpayers to challenge the resolution on the ground that it fails to provide for fully informed consent (*see generally* Public Health Law § 2441 [5]; § 2442).[2] A citizen taxpayer may seek "equitable or declaratory relief . . . against an officer or employee of the state who in the course of his or her duties [causes] a wrongful expenditure . . . or any other illegal or unconstitutional disbursement of state funds" (State Finance Law § 123-b [1]; *see Saratoga County Chamber of Commerce v Pataki*, 100 NY2d 801, 813 [2003], *cert denied* 540 US 1017 [2003]). While standing under State Finance Law § 123-b does not depend on a showing of aggrievement, the citizen taxpayer's claim "must have a sufficient nexus to fiscal activities of the [s]tate" (*Saratoga County Chamber of Commerce v Pataki*, 100 NY2d at 813 [internal quotation marks and citation omitted]). "The statute is narrowly construed, and claims seeking review of a state actor's alleged mismanagement of funds or the arbitrary and capricious distribution of funds lawfully allocated to an agency are not covered by section 123-b" (*Matter of Humane Socy. of U.S. v Empire State Dev. Corp.*, 53 AD3d 1013, 1016 [2008], *lv denied* 12 NY3d 701 [2009] [internal quotation marks, brackets and citations omitted]; *accord Matter of Vector Foiltec, LLC v State Univ. Constr. Fund*, 84 AD3d 1576, 1578 [2011]). Here, petitioners assert that the informed consent standards developed by ESSCB's ethics committee are inadequate to ensure that the consent of compensated donors will be truly voluntary. This is a challenge to the manner in which the donor compensation program is conducted, rather than to the agency's authority to conduct it; as such, it is "not of the kind for which State Finance Law § 123-b confers standing" (*Matter of Transactive Corp. v New York State Dept. of Social Servs.*, 92 NY2d 579, 589 [1998]).

Petitioners further contend that they have common-law standing as taxpayers to raise the informed consent challenge. This doctrine permits "taxpayers to challenge important governmental actions, despite such parties being otherwise insufficiently interested for standing purposes, when the failure to accord such standing would be in effect to erect an impenetrable bar-

---

**2.** Petitioners do not challenge on appeal Supreme Court's determination that Feminists Choosing Life of New York, Inc. lacked standing; accordingly, that issue is deemed abandoned (*see Matter of Defreestville Area Neighborhood Assn., Inc. v Planning Bd. of Town of N. Greenbush*, 16 AD3d 715, 718 n 2 [2005]).

rier to any judicial scrutiny of legislative action" (*Matter of Colella v Board of Assessors of County of Nassau*, 95 NY2d 401, 410 [2000] [internal quotation marks and citation omitted]; *accord Matter of Vector Foiltec, LLC v State Univ. Constr. Fund*, 84 AD3d at 1578-1579). No such impenetrable barrier exists here, since no showing has been made that an oocyte donor would be unable to challenge the procedures used to obtain her informed consent (*see Matter of Transactive Corp. v New York State Dept. of Social Servs.*, 92 NY2d at 589; *compare Saratoga County Chamber of Commerce v Pataki*, 100 NY2d at 814-815). Accordingly, Supreme Court correctly concluded that the individual petitioners lack standing to raise this claim and declined to address its merits.

A brief review of the pertinent scientific terms will be helpful before addressing the substantive issues. Stem cells are "stem or progenitor cells that divide and are capable of generating one or more different types of progeny. Stem cells and their progeny can potentially repair or replace specific tissues or be used to develop disease models" (Public Health Law § 265). Embryonic stem cells can be created through in vitro fertilization, in which an oocyte is fertilized and permitted to develop into a blastocyst. A blastocyst is an early stage in the development of an embryo, consisting of a hollow structure of 100 to 250 cells with an inner layer of "pluripotent" stem cells, meaning that the cells are capable of developing into any cell in the body. In theory, stem cells may also be developed through somatic cell nuclear transfer (hereinafter SCNT), in which the nucleus of an oocyte is replaced with the nucleus of a somatic cell (that is, a cell that is neither an egg nor a sperm), and the oocyte—now carrying the genetic material of the somatic cell—is stimulated to grow into a blastocyst. However, stem cells have not yet been successfully developed from human oocytes using SCNT.

Petitioners contend that Supreme Court erred in rejecting their claim that ESSCB exceeded its statutory authority in authorizing the Fund to compensate women for oocyte donations that may be used to create stem cells using SCNT. In their view, the donor compensation program violates Public Health Law § 265-a (2), which provides that "[n]o grants made available in the [F]und from any source shall be directly or indirectly utilized for research involving human reproductive cloning."[3] We reject this contention, finding that the use of SCNT to cre-

---

3. Supreme Court found that the individual petitioners had standing to raise this claim.

ate stem cells does not constitute "human reproductive cloning" and that the donor compensation program does not improperly make grant funds available to be "directly or indirectly utilized" for such cloning.

The Legislature did not provide a definition of the phrase "human reproductive cloning" (*see generally* Public Health Law, art 2, tit 5-A). When the interpretation of unambiguous language depends on "pure statutory reading and analysis," courts accord no deference to an agency's interpretation (*Kurcsics v Merchants Mut. Ins. Co.*, 49 NY2d 451, 459 [1980]). However, "where the statutory language is special or technical and does not consist of common words of clear import, courts will generally defer to the agency's interpretative expertise unless that interpretation is unreasonable, irrational or contrary to the clear wording of the statute" (*Kennedy v Novello*, 299 AD2d 605, 607 [2002], *lv denied* 99 NY2d 507 [2003] [internal quotation marks and citations omitted]; *see Matter of New York State Assn. of Life Underwriters v New York State Banking Dept.*, 83 NY2d 353, 359-360 [1994]). We agree with Supreme Court that the meaning of "human reproductive cloning" is not commonly understood, and that ESSCB's administrative expertise in interpreting this technical term is entitled to deference (*see Matter of Teachers Ins. & Annuity Assn. of Am. v City of New York*, 82 NY2d 35, 41-42 [1993]; *Kennedy v Novello*, 299 AD2d at 608).

Under ESSCB's interpretation, "human reproductive cloning" means attempting to establish a pregnancy or the birth of a human child by transferring a human embryo created by SCNT into a woman's uterus, and does not include "therapeutic cloning," in which SCNT is used to produce stem cells for research or therapeutic purposes. Respondents supported this interpretation with an affidavit from Lawrence Sturman, the Executive Director of New York State's stem cell program, averring that ESSCB's definitions of "human reproductive cloning" and "therapeutic cloning" are "well-established in the scientific community and in scientific literature." In addition, respondents provided a variety of scientific documents using similar definitions. For example, "[h]uman reproductive cloning" is defined in the Guidelines for the Conduct of Human Embryonic Stem Cell Research, prepared in 2006 by the International Society for Stem Cell Research, as "the act of seeking to establish either a pregnancy or the birth of a child by gestating or transfe[r]ring into a uterus human embryos that have been derived in vitro by

nuclear transfer or nuclear reprogramming." A report of the National Academies of Science defines "human reproductive cloning" as "an assisted reproductive technology that would be carried out with the goal of creating a human being," and a fact sheet prepared by the Human Genome Project of the Department of Energy distinguishes "reproductive cloning"—defined as "a technology used to generate an animal that has the same nuclear DNA as another currently or previously existing animal"—from "therapeutic cloning," defined as "the production of human embryos for use in research."

Notably, at least three states have enacted stem cell research legislation defining "human reproductive cloning" in terms consistent with ESSCB's interpretation (*see* Cal Health & Safety Code § 125292.10 [k]; Mass Gen Laws Ann ch 111L, § 2; Iowa Code § 707C.3 [1]). The Iowa provision explicitly provides that human reproductive cloning "does not include somatic cell nuclear transfer performed for the purpose of creating embryonic stem cells" (Iowa Code § 707C.3 [1]). While it is true, as contended in one of the amicus briefs, that the Legislature could have chosen to include a similarly specific definition of the phrase "human reproductive cloning" in the Stem Cell Act, it is also true that if the Legislature had intended to prohibit funding any stem cell research involving SCNT, it could have said so explicitly. Nothing in the Stem Cell Act or the record indicates that the Legislature intended the phrase "human reproductive cloning" to convey such a limitation. Accordingly, we agree with Supreme Court that respondents' interpretation of the term "human reproductive cloning" is not unreasonable or irrational (*see Matter of Golf v New York State Dept. of Social Servs.*, 91 NY2d 656, 663-665 [1998]; *Matter of New York State Assn. of Life Underwriters v New York State Banking Dept.*, 83 NY2d at 360).

Petitioners argue, nonetheless, that even if the use of SCNT to produce stem cells is not "human reproductive cloning," funding for SCNT research—including the donor compensation program—is prohibited because knowledge derived from such research could be "*indirectly* utilized for research involving human reproductive cloning" (Public Health Law § 265-a [2] [emphasis added]). In this regard, they point out that the initial steps in using SCNT to develop a blastocyst to produce stem cells are identical to the steps that would be taken to produce such a blastocyst for the purpose of human reproduction. As knowledge gained from research using SCNT to produce

blastocysts for therapeutic purposes might be indirectly applicable to human reproductive cloning, petitioners argue that funding for such research is statutorily prohibited. We reject this construction of the statute.

Interpretation of the phrase "directly or indirectly" is a matter of pure legal analysis that requires no deference to specialized agency expertise (*see Matter of Teachers Ins. & Annuity Assn. of Am. v City of New York*, 82 NY2d at 42; *Matter of Lewis Family Farm, Inc. v New York State Adirondack Park Agency*, 64 AD3d 1009, 1013 [2009]). " '[T]he statutory text is the clearest indicator of legislative intent and courts should construe unambiguous language to give effect to its plain meaning' " (*Matter of Emigrant Bancorp, Inc. v Commissioner of Taxation & Fin.*, 59 AD3d 30, 33 [2008], quoting *Matter of DaimlerChrysler Corp. v Spitzer*, 7 NY3d 653, 660 [2006]). The unambiguous language of Public Health Law § 265-a (2) addresses and specifically identifies the kind of research for which grant funds are not to be "directly or indirectly" used—that is, "research involving human reproductive cloning." Petitioners' interpretation equates the indirect use of grants for research involving human reproductive cloning with the use of state-funded research results by subsequent researchers who themselves receive no ESSCB funding. However, as the statute is written, the adverb "indirectly" applies to the utilization of grants, not to the utilization of research results. The use of knowledge derived from state-funded research does not equate to an indirect use of state funds. No language in the statute prohibits the use of grants for research that does not "involv[e] human reproductive cloning," even if that research could somehow result in knowledge applicable to such cloning. To imply such a prohibition from the single word "indirectly" would effectively rewrite the statute by adding language not found therein (*see Matter of Trump-Equitable Fifth Ave. Co. v Gliedman*, 62 NY2d 539, 545 [1984]; *Matter of Rossi v Nyquist*, 59 AD2d 1001, 1001 [1977]).

Statutes must be construed as a whole, reading all parts together to determine the legislative intent (*see Friedman v Connecticut Gen. Life Ins. Co.*, 9 NY3d 105, 115 [2007]; McKinney's Cons Laws of NY, Book 1, Statutes § 97). Petitioners' interpretation of Public Health Law § 265-a (2) conflicts with this principle. A prohibition against funding any research that might indirectly advance human reproductive cloning would effectively include a broad range of stem cell research, contravening the legislative authorization to ESSCB "to make

grants to . . . activities that will advance scientific discoveries in fields related to stem cell biology" (Public Health Law § 265-a [1]). Instead, we conclude that the Legislature used the word "indirectly" in Public Health Law § 265-a (2) to forbid the indirect utilization of grant funds for "research involving human reproductive cloning" by such means as diverting grant funds that were originally awarded to support legitimate stem cell research, to be used instead for research addressing human reproductive cloning.[4] Accordingly, respondents' donor compensation program does not violate Public Health Law § 265-a, and Supreme Court properly dismissed the petition.

SPAIN, J.P., LAHTINEN, KAVANAGH and MCCARTHY, JJ., concur.

Ordered that the judgment is affirmed, without costs.

---

4. Consistent with such an interpretation, ESSCB's contract policy states that no research will be funded unless it complies with all laws and with certain guidelines forbidding human reproductive cloning. Further, as mandated by the Public Health Law, ESSCB's policy establishes review and oversight procedures to enforce compliance with these requirements after grant funds are awarded (see Public Health Law § 265-b [2] [g]; § 265-c [2] [c]).